2024-1432

---

IN THE
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**GOOGLE LLC,**
*Appellant*

*v.*

**NOBOTS LLC,**
*Appellee*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in
Case No. IPR2022-00940

---

**RESPONSIVE BRIEF OF APPELLEE NOBOTS LLC**

---

Stephen D. Zinda
James H. Hall
Tel: 832-631-9992
Fax: 832-631-9991
Stephen@CHZFirm.com
James@CHZFirm.com
CABELLO HALL ZINDA, PLLC
801 Travis Street, Suite 1610
Houston, TX 77002

*Counsel for Appellee Nobots LLC*

## CLAIM 19 (APPX61) FROM U.S. PATENT NO. 9,595,008

19. A method for assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application, the method comprising:

a) acquiring interest data from the client computing device prior to delivery of issued data by the server to the client computing device;

b) comparing the interest data to model data relating to human interaction with a computing device prior to the time in which the interest data is acquired; and

c) generating a value that represents a confidence level that a human user rather than an autonomic user operated the client computing device prior to the time in which the interest data is acquired.

**Certificate of Interest**

Counsel for Appellee Nobots LLC certifies as follows:

1. The full names of every party represented by me is:

Nobots LLC

2. The name of the real party in interest represented by me is:

None.

3. All parent corporations and publicly held companies that own 10 percent or more of stock in the party represented by me are:

None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

None

5. The pending trial court proceedings will be directly affected by this Court's decision:

*Nobots LLC v. Google LLC,* 1-22cv-00585-RP (W.D. Tex.)

6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable.

Dated: August 26, 2024

/s/ Stephen D. Zinda
Stephen D. Zinda
Attorney for Appellee

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES....................................................................1

COUNTER-STATEMENT OF THE ISSUE FOR APPEAL ....................................2

I. SUMMARY OF THE ARGUMENT.................................................................3

II. ARGUMENT.................................................................................................8

A. The Board Correctly Determined that Kitts Cannot Anticipate Because the ’008 Patent Defines Any Act of “Acquiring Data” to Require the Retrieval of At Least Some “Active Data.”..............................................................................8

B. The Board Properly Rejected Google’s Efforts to Expand the Scope of the Claims to Ensnare Kitts. ..........................................................................13

1. Google’s “Plain [Claim] Language” is Premised on a Fundamental Misapplication of Law. .....................................................................14

2. The Court Should Reject Google’s Attempts to Fabricate Confusion and Distort the Law. ................................................................................17

3. Google’s Reliance on Claim 20 Is Improper and Incorrect. .......................38

4. Google’s Reliance on Nobots’s Preliminary Infringement Contentions is Misplaced and Misleading. ...............................................................49

III. CONCLUSION ............................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Arendi S.A.R.L. v. Google LLC*,
882 F.3d 1132 (Fed. Cir. 2018) .................... 43

*Astrazeneca AB v. Mut. Pharm. Co.*,
384 F.3d 1333 (Fed. Cir. 2004) .................... 23

*Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) .................... 11, 24

*Bozeman Fin. LLC v. Federal Rsrv. Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020) .................... 33

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012) .................... 11, 12, 14

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) .................... 8, 11

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) .................... 50, 53

*Fitbit, Inc. v. Valencell, Inc.*,
964 F.3d 1112 (Fed. Cir. 2020) .................... 47

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008) .................... 34-35

*Hylete LLC v. Hybrid Ath., LLC*,
931 F.3d 1170 (Fed. Cir. 2019) .................... 33

*In re Cree, Inc.*,
818 F.3d 694 (Fed. Cir. 2016) .................... 43

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) .................... 34, 35, 39, 53

*Kruse Tech. P'ship v. Volkswagen AG*,
544 F. App'x 943 (Fed. Cir. 2013) .................... 49

*Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*,
878 F.3d 1336 (Fed. Cir. 2018) .................... 43

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016) ........................................................................ 49

*Netflix, Inc., v. DivX, LLC, No. 2021-1931*,
2022 U.S. App. LEXIS 17573 (Fed. Cir. 2022) ................................................ 34

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
7 F.3d 1571 (Fed. Cir. 1993)...............................................................................49

*Pavo Sols. LLC v. Kingston Tech. Co.*,
35 F.4th 1367 (Fed. Cir. 2022) ........................................................................... 47

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ......................... 14-15, 15, 19, 20, 22, 23, 54, 55

*Profectus Tech. LLC v. Huawei Techs. Co.*,
823 F.3d 1375 (Fed. Cir. 2016) ........................................................... 43, 44, 46

*Renishaw PLC v. Marposs Societa per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)........................................................................... 54

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ................................................................. 6, 7, 23

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ........................................................................... 23

*World Class Tech. Corp. v. Ormco Corp.*,
769 F.3d 1120 (Fed. Cir. 2014) ................................................................... 17, 19

## STATEMENT OF RELATED CASES

Appellee Nobots LLC ("Nobots") identifies the following case involving U.S. Patent No. 9,595,008 ("the '008 patent") that may directly affect or be directly affected by a decision in this appeal: *Nobots LLC v. Google LLC*, 1-22cv-00585-RP (W.D. Tex.). The district court case remains stayed pending completion of this appeal. *Nobots LLC v. Google LLC*, 1-22cv-00585-RP, Dkt. No. 64 (W.D. Tex.).

## COUNTER-STATEMENT OF THE ISSUE FOR APPEAL

Did the U.S. Patent Trial and Appeal Board ("Board") correctly construe "acquiring interest data" to require the retrieval of "active data," where: (1) the specification explicitly defines "acquired data" and "*its equivalents and verb forms*" as requiring "active data"; (2) "acquiring data" is indisputably a verb form of "acquired data;" (3) "acquiring interest data" is therefore the narrower act of "acquiring data" where the data acquired comprises "interest data;" and (4) the specification repeatedly and consistently uses various forms of "acquire" (including "acquiring") to refer to retrieving "active data" in accordance with the explicit definition?

# I. SUMMARY OF THE ARGUMENT

The Board correctly determined claim 19 is not anticipated because Kitts does not disclose the step of "acquiring interest data." *Infra* Section II.A. The specification expressly defines "acquired data" and "its equivalents and ***verb forms***" to require "active data." The act of "acquiring data" is a ***verb form*** of "acquired data." Thus, "acquiring data" of any kind, including "interest data," requires retrieving at least some active data. Based on this express language in the patent, the Board correctly concluded that "acquiring interest data" necessarily requires the retrieval of interest data that includes at least some active data.

The balance of the specification confirms the Board's construction is correct. It repeatedly and exclusively associates "acquired" and "acquiring" with "active data" and teaches that such "acquired data requires some form of information capture means"—describing how, in at least some embodiments, "the computing device is caused to monitor and retain certain data useful as acquired data for comparison purposes," including by, "without limitation, [via] modification of (an) existing program(s) (e.g., such means are included in available browsers), a covert program (e.g., many malware applications log keystrokes and periodically pass them to remote servers for malicious purposes; similar technology can be used to exploit necessary aspects of the invention embodiments), or a servlet/Java applet." In addition, the undefined terms "receiving," "collecting" or "obtaining" are used

throughout the specification in reference to general data retrieval. If claim 19 was intended to encompass the retrieval of *any* data as Google contends, the patentee would have used any one of these broader, undefined terms. The patentee's deliberate choice to instead invoke an explicitly defined act—"acquiring data"—in claim 19 defeats Google's argument.

Google's efforts to dodge the patent's express definition fall flat. In its bid to ensnare Kitts within the scope of claim 19, Google blatantly misapplies the law and misreads the claim and specification. Google's arguments were therefore properly rejected by the Board, and this Court should do the same. *Infra* Section II.B.

Google first focuses on the "plain language" of claim 19 in isolation, declaring that "nothing in the claim language" suggests that the plain meaning should not apply. *Infra* Section II.B.1. This "plain language" argument is nothing more than a smokescreen to distract from the specification's unambiguous definition. As this Court has repeatedly instructed, claims do not stand alone and must be read *in view of the specification*. Google thus cannot avoid the specification's clear definitions by invoking "plain language."

Google makes the same mistake when it relies on the term "interest data" in isolation. According to Google, because "interest data" may comprise "active data" or "passive data" (or both), that necessarily means that the "interest data" of claim 19 must encompass passive data alone. *Infra* Section II.B.2.a. But that argument

effectively writes out the claim's requirement of "*acquiring* interest data." And according to the specification, *acquiring* such data requires the retrieval of active data. Thus, claim 19's limitation that data be *acquired* (and not merely "retrieved," "obtained," or "collected") further modifies the interest data encompassed by the claim—the interest data that is acquired must contain at least some active data. Google cannot simply turn a blind eye to a critical term in the claim language at issue ("acquiring") to reach an outcome that benefits Google.

Even when Google does acknowledge the specification's definition of "acquired [or acquiring] data," Google jumps through hoops to cast the definition aside. For instance, Google mischaracterizes the Board's conclusion as improperly extending the patent's definition of "acquired data" to the word "acquiring" alone. *Infra* Section II.B.2.b. Again, Google's retelling omits critical context. The claim language that the Board interpreted is "*acquiring* interest *data*." As the Board properly recognized, the specification defines "acquired data" and "its equivalents and verb forms," and "acquiring data" is immediately identifiable as a verb form of "acquired data." It only follows, then, that acquiring data in the form of "interest data" (a type of data), as claim 19 recites, necessarily requires retrieving active data.

To further distance the claim language from the specification's definition, Google applies a heightened, hyper-precise lexicography standard entirely unmoored from this Court's precedent. *Infra* Section II.B.2.c. This Court has never

required a patentee to expressly define the exact verbatim claim language before it can be its own lexicographer. Instead, this Court's precedent requires only that the patentee "clearly express an *intent* to redefine the term." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation and citations omitted). Here, where the specification explicitly defines "acquiring data" (as a verb form of "acquired data"), repeatedly and exclusively associates various forms of "acquire" (including "acquiring") with active data, and teaches that "acquiring" requires a way to capture active data (e.g., keylogger software), the patentee has far surpassed this Court's lexicography standard.

Nor can Google identify a single inconsistency between the Board's construction and the specification. It instead resorts to fabricating ambiguity regarding the "two series of embodiments" discussed in the specification. *Infra* Section II.B.2.d. But Google's argument is propped up by nothing more than a misreading of the specification and circular logic. It is telling that this is *the only* intrinsic evidence that Google can muster purportedly supporting its position.

Google's accusation that the Board improperly "re-wrote" the claims can also be easily disposed. For one, neither this theory nor any of the arguments Google offers to support it were ever raised before the Board. They are thus forfeited. *Infra* Section II.B.2.e. Regardless, this forfeited theory lacks merit because it is premised on a fundamental misinterpretation of the Board's construction and purely

speculative assumptions about the intent behind *other* terms in claim 19. *Id.*

Instead, it is Google that seeks to rewrite the claims. Specifically, to conjure support for its claim construction, Google revises claim 20 to depend from claim 19. As an initial matter, Google waived this issue because it did not appeal either the Board's construction of claim 20 as depending from claim 1, or the Board's determination that claim 20 is invalid based on Willner and Kitts under that construction. Nor could it—both of these Board conclusions were ***expressly requested by Google in its petition***. *Infra* Section II.B.3.a.

Even if this issue had not been waived, however, the Board's determination that claim 20 depends from claim 1 must be affirmed. First, the Board correctly determined that the prosecution history demonstrates that the dependency on claim 1 is correct, and that Google's contrary argument rests entirely on speculation. *Infra* Section II.B.3.b-c. Second, at a minimum there is a reasonable debate as to the nature of the error in claim 20. Under this Court's precedent, that reasonable debate precludes adopting Google's self-serving correction. *Infra* Section II.B.3.d.[1]

In its last-ditch effort to avoid the Board's construction of claim 19, Google tries to bind Nobots to its preliminary infringement contentions. This effort likewise

[1] Indeed, Google itself had proposed that claim 20 is "indefinite" based on the lack of antecedent basis for "the interest data." Only *after* appreciating the significance of its failure to account for the definition of "acquired data" and "its equivalents and verb forms" when applying Kitts did Google abruptly abandon its indefiniteness position to instead argue that claim 20 has an "obvious typo" in claim dependency.

fails, for three reasons. First, as even Google must acknowledge, Nobots's contentions were *preliminary*. They are thus definitionally nonbinding. Google's only support to the contrary, *Data Engine Techs. LLC v. Google LLC*, is inapposite. Unlike here, the construction in *Data Engine* was formally *adopted* by the Federal Circuit in a prior appeal. *Infra* Section II.B.4.a. Moreover, Google's arguments rely on cherrypicked excerpts of the contentions, wrenched from their context. When considered as a whole, Nobots's preliminary infringement contentions are in fact consistent with the Board's claim construction. *Infra* Section II.B.4.b. Furthermore, what governs is not the parties' alleged preliminary positions in the litigation, but rather the correct construction—that is, the construction that hews most closely to the claim and patent language. *Infra* Section II.B.4.c. Because the specification here dictates that the Board's construction is correct, the Board's determination with respect to claim 19 must be affirmed.

## II. ARGUMENT

### A. The Board Correctly Determined that Kitts Cannot Anticipate Because the '008 Patent Defines Any Act of "Acquiring Data" to Require the Retrieval of Some "Active Data."

Nobots has "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning," and under this Circuit's precedent, "that definition governs." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (internal quotation and citation omitted).

As even Google concedes, the specification of the ’008 patent expressly defines “acquired data” and “its equivalents and verb forms” to require “active data”:

> [T]he term “acquired data”, ***its equivalents and verb forms comprises*** data associated with a computing device’s operation and its interaction with a computing environment, such as the Internet, that is generally not recorded within the computing device and/or by other devices that have been affected by the computing device’s operation, but at least some data of which has/have been recorded and/or transmitted to a remote location, such as a server—***this is a type of active data***.

Appx60 (3:24-32) (emphasis added). “Acquiring data” is a verb form of “acquired data” (another fact that Google seemingly does not dispute). Appx16-17 (the Board explaining that “acquiring” is “immediately identifiable as a verb form of ‘acquired’”). The act of “acquiring data” of any kind is thus clearly defined by the specification as requiring the retrieval of active data.

The remainder of the specification confirms that “acquiring data” requires active data. It repeatedly associates “acquired” and “acquiring” with “active data” and teaches how “acquired data ***requires*** some form of information capturing means,” such as “monitoring and retaining means” (e.g., covert key logging software) on the client device to capture active data (e.g., keystrokes, mouse cursor movement):

> While available data represents data that is readily harvestable by query, for example, from the computing device or the computing environment in which the device operates, ***acquired data*** **requires some form of information capture means**. In the various embodiments described herein, **the computing device is caused to monitor and retain certain data useful as** ***acquired data*** for

> comparison purposes. **Such monitoring and retaining means for *acquiring data*** from the computing device comprises….

Appx60 (3:66-4:17) (emphasis added); Appx1286-87 (¶ 53). Furthermore, the specification refers to "*active* model data" as "acquired," but in contrast, it refers to "*passive* model data" as simply "available data." *Compare* Appx59-60 (2:60-3:9) *with* Appx60 (3:9-17); Appx1287 (¶ 54). These references further evidence that "acquired data" is active data, and "acquiring data" is the act of retrieving active data.

Given that acquiring data requires the retrieval of active data, "acquiring interest data" necessarily requires the retrieval of "interest data" comprising "active data." Appx1288-89 (¶ 55). As the specification teaches (and as Google itself acknowledges), "interest data" is merely a type of data. *See* Blue Brief ("BB"), 26 (conceding that "interest data" is a "type of data"). Generally, "interest data" may include "active" or "passive" data (or both). Appx60 (3:41-46). But claim 19's phrase "acquiring interest data" adds the specific limitation that the "interest data" be *acquired*. Appx1289 (¶ 56). Because "acquired data" or "acquiring data" requires active data, imposing this additional limitation on the "interest data" in claim 19 requires that the referenced interest data include *active* data (with or without *passive* data). Put differently, when "interest data" is "acquired" (or when one is "acquiring interest data"), that acquired interest data necessarily must include "active data." The remaining claim language cements the understanding that the "interest data" in claim

19 is "acquired data" and, therefore, must include at least some active data. Appx61 (6:51-57) (step b) and step c) of claim 19 reciting that "the interest data is ***acquired***") (emphasis added).

Also telling is the fact that the patentee knew how to—and elsewhere did—use terms other than "acquiring" when intending to refer broadly to the retrieval of *any* data. For example, the patentee used the terms "receive," "obtain," and "collect." Appx59 (2:54-58) (discussing data "***received*** by a computing device"); Appx60 (3:38-41) (discussing data that can be "***obtained*** from the computing device"); *Id.* (3:41-44) (explaining that data may be "***obtained*** prior to or after the generation of issued data"); Appx58 (Fig. 4, element 410) (stating that "[a]ctive or passive data ***collected*** is compared with stored model data"). In fact, the term "acquired" and "obtained" are both used in reference to data in the same sentence. Appx60 (3:38-41). This confirms that those terms have different meanings in the context of the specification. *See, e.g.*, *Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1272-73 (Fed. Cir. 2001) (differentiating between two terms where they "are used separately and distinctly"); *See* C*hi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) ("The general presumption that different terms have different meanings remains."). If the patentee had intended for claim 19 to encompass the retrieval of passive data alone (without "active data"), one of these other terms would have been used.

The Board did not err in reaching the same conclusion, and its reasoning reflects the clear disclosures of the specification. As the Board correctly explained, "the '008 patent states that 'acquired data' and 'its equivalents and verb forms' is 'a type of active data'" and "acquiring" is "immediately identifiable as a verb form of 'acquired'" in the context of the '008 patent. Appx16-17 (citing Appx60 (3:25-32)). It also recognized that in the specification, "it is 'active data' that is connected to the word 'acquired' and 'passive data' that is connected to the word 'available.'" Appx16. Furthermore, contrary to Google's assertions, the notion that "acquired" data may encompass only "passive data" is "entirely absent from other portions of the Specification." *Id*. Accordingly, the Board found that Nobots's "construction of the term 'acquiring interest data' is consistent with, and supported by, the Specification of the '008 patent" and accordingly "'acquiring interest data' must encompass the retrieval of some active data." Appx17.

The Board's claim construction should thus be affirmed. The '008 patent defines the act of "acquiring data" as retrieving at least some "active data." In turn, "acquiring interest data" (a type of "data") is the act of retrieving interest data comprising active data. Indeed, if the broader act of "acquiring data" of any kind requires the retrieval of at least some active data, then the narrower act of "acquiring interest data" must also necessarily require retrieving active data. Because Kitts cannot anticipate under the correct construction of "acquiring interest data," the

Board's determination that Kitts was not shown to render claim 19 unpatentable must be affirmed.

### B. The Board Properly Rejected Google's Efforts to Expand the Scope of the Claims to Ensnare Kitts.

In both the litigation and the IPR proceedings, Google acknowledged that the specification sets forth definitions and expressly requested that those definitions be applied. Appx1015-16 (in preliminary claim constructions, proposing definitional construction for "active model data," "passive model data" based on exact language from the specification); Appx138 (in petition, applying the specification's meaning of "model data," "available data," "issued data," "monitored data," and "interest data"). But Google ignored or overlooked the express definition of "acquired data" and "***its equivalents and verb forms***" when applying the disclosures of Kitts to claim 19. Now, Google seeks to improperly ensnare the disclosures of Kitts by construing "acquiring interest data" in a manner entirely divorced from the specification.

Ultimately, Google cannot reconcile its wayward claim construction with the specification's express definition of "acquiring data," or the specification's uniform usage of "acquire," "acquiring," and "acquired," as requiring the retrieval of active data. For instance, if the defined act of "acquiring data" of any type requires the retrieval of at least some active data, how can it be that the narrower act of acquiring data in the form of interest data does not require the retrieval of at least some active data? Additionally, if the patentee had intended for the claim to encompass the

retrieval of *any* data as Google alleges, then why did the patentee choose to use a specifically defined word ("acquiring") rather than an undefined term (like "receiving," "obtaining," or "collecting") that more broadly encompasses the retrieval of any data? Google has no answers to these questions. Instead, Google advances a series of irrelevant and illogical arguments to distract from the specification's unambiguous definition. Each of these arguments lacks merit for the reasons discussed below.

#### 1. Google's "Plain [Claim] Language" is Premised on a Fundamental Misapplication of Law.

Google begins its argument focusing on the claim language in isolation, citing Federal Circuit precedent for the principles that "the claims of a patent define the invention" and claim construction "begins and ends in all cases with the actual words of the claim." BB, 25. Google then argues that the claim uses certain terms "according to their ordinary meaning," such as "acquiring," "comparing," and "generating" and "[n]othing ***in the claim language*** would suggest to the public that the patentee intended for 'acquiring' to have a unique meaning that limits the type of data that is retrieved." *Id.* at 25-27 (emphasis added and omitted). Google's "plain language" argument is a red herring.

First, Google disregards one of the most fundamental tenets of claim construction: "The claims, of course, do not stand alone" and "***must be read in view of the specification, of which they are a part***." *Phillips v. AWH Corp.*, 415 F.3d

1303, 1315 (Fed. Cir. 2005) (emphasis added) (internal quotations and citations omitted). Indeed, "the specification is always highly relevant to the claim construction analysis. ***Usually, it is dispositive; it is the single best guide to the meaning of a disputed term***." *Id.* (emphasis added) (internal quotations and citations omitted).

Ignoring this Court's mandate, Google instead self-servingly views the claim language in a vacuum so that it can falsely declare that "acquiring" is used in accordance with its ordinary meaning of "retrieving."[2] In doing so, Google turns a blind eye to the explicit definitional language from the specification, as well as the specification's repeated and exclusive association of various forms of "acquire" with "active data" and its teaching that "acquiring" involves the use of "some form of information capture means." *See, e.g.,* Appx60 (3:66-4:17) (explaining that unlike available data, which is "readily harvestable by query," "*acquired data* requires some form of information capture means" and that "the various embodiments described herein … [describe] monitoring and retaining means for *acquiring data* from the computing device") (emphasis added). Google's assertion that nothing in "step a) limits what type of data to acquire other than 'interest data'" is thus plainly

[2] The internal inconsistency in Google's misguided argument is apparent when considering other claim terms. For example, under Google's flawed logic, the claim terms "model data" and "issued data" would also carry their ordinary meaning based on the "plain language" of the claims. Yet Google admits those terms are also defined by the specification. BB, 27.

wrong in light of the specification's explicit definitions.

Even setting aside Google's failure to view the claims in light of the specification, the claim language does not support the notion that "acquiring interest data" is being used "in accordance with its ordinary meaning." Google essentially argues that its proposed construction must be right because if the phrase "acquiring interest data" was (incorrectly) construed to mean "retrieving interest data," the claim steps would still make logical sense. That is not probative, however. The claim steps are *also logical* under the correct construction of "acquiring interest data" adopted by the Board. Nor has Google ever argued that the Board's construction is inconsistent with the remaining claim language. To the contrary, as discussed above, the claim language *supports* the Board's construction. *See* Section II.A, *supra* (discussing steps b) and c) in claim 19).

At bottom, Google cannot genuinely dispute that application of the specification's definition of "acquired data" is not limited to any specific type of "data," or that "acquiring data" is an "immediately identifiable" verb form of "acquired data," as the Board correctly recognized. Appx16-17. Because the claimed "interest data" is simply a "type of data," as even Google admits, when that interest data is acquired, it *must* include active data. Google cannot change this conclusion by improperly viewing the claims in a vacuum.

### 2. The Court Should Reject Google's Attempts to Fabricate Confusion and Distort the Law.

Google correctly acknowledges that a "patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014). That is exactly what the patentee did here by explicitly defining the act of "acquiring data" (of any kind) to require the retrieval of at least some "active data." Given that "interest data" is a type of "data," the step of "acquiring interest data" plainly requires the retrieval of interest data comprising "active data." This conclusion fits the express definition, the balance of the specification associating various forms of "acquire" with "active data," and the rest of the claim language. *Supra* Section II.A. Google's arguments to the contrary are contrived to fabricate ambiguity where none exists.

#### a. *Google's Reliance on the Definition of "Interest Data" in Isolation is Misplaced.*

Google improperly focuses on the definition of "interest data" in isolation, arguing that because "interest data" is defined as including active or passive data, "[i]t follows that '*acquiring interest data*' means simply retrieving active data or

passive data (or both)." BB, 28-29 (emphasis in original).[3] The obvious fallacy of this argument is that it cannot be reconciled with the rest of the specification.

While "interest data" when standing alone may comprise active or passive data (or both), when interest data is "acquired" (rather than the broader, undefined terms "obtained," "collected," or "received" as used in the specification), the acquired interest data must include at least some active data per the specification's express definition of "acquiring data." That is, the defined act of *acquiring* (unlike simply "retrieving," "obtaining," or "collecting") the *interest data* further modifies or limits that data—it must comprise at least some active data, because it is *acquired* (e.g., using key logging software). The Board's construction therefore fully comports with the definition of "interest data," which may include active data. Google's contrary position disregards the fact that "acquiring interest data" as construed by the Board is consistent with the definitions of both "interest data" and "acquiring data"—those definitions logically fit together in claim 19.

Google further argues that the plain meaning must apply because "[n]othing

[3] Google states that the specification defines "'interest data,' its equivalents and verb forms," but "[w]hat exactly 'equivalents and verb forms' means in this context is not entirely clear, as at least the term 'interest data' has no verb form that either party's expert could identify." BB, 28. However, this is entirely irrelevant to the disputed term "acquired data" and its "equivalents and verb forms" The Board correctly found that "acquired data" has the "immediately identifiable" verb form "acquiring data," and Google has never disputed that "acquiring" is a verb form of "acquired." Appx17.

in the claim's plain language" or the two definitions of "interest data" and "issued data" suggests that "interest data" is limited to including at least some active data. BB, 29. This is merely a recycled version of Google's "plain claim language" argument, which wrongly focuses on the claim language in isolation without any deference to the specification and how the defined act of "acquiring data" applies to "*acquiring* interest data."

Google also contends that applying the patent's definitions of "interest data" and "issued data" "results in an entirely logical method step" and so the plain meaning must apply. *Id.* However, claim construction is not guided by whether a proposed construction produces a "logical" result—it is guided by analyzing the claim language in light of the specification and prosecution history. *Phillips*, 415 F.3d at 1315. In any event, the Board's construction is fully supported even when applying Google's own reasoning. Applying the specification's definitions of "acquiring data," "interest data," and "issued data" such that "acquiring interest data" requires the retrieval of interest data comprising at least some active data, *also* "results in an entirely logical method step." Google cannot reasonably dispute this.

*b. <u>Google Mischaracterizes the Board's Reasoning.</u>*

Google's next argument is based on its mischaracterization of the Board's reasoning as assigning a new definition to the term "acquiring" alone, divorced from the express definition:

> The Board reasoned that the word "*acquiring*" in the larger disputed claim phrase "*acquiring interest data*" is a verb form of the word "acquired," and from there reasoned that the patent's definition of "acquired data" applies to the claim term "*acquiring*" too. Appx16-17. Stated simply, **the Board held that the word "*acquiring*" has a novel meaning in the context of the '008 patent**, and that that meaning limits the type of data that is retrieved to being active data. *Id.* This was erroneous.
>
> The defined phrase in the specification that the Board seized upon is "acquired data." The word "*acquired*," by itself, is not defined. And the larger disputed claim phrase "*acquiring interest data*" is not defined either. Moreover, neither "*acquiring*" nor "*acquiring* ***interest*** *data*" is a verb form of "acquired data."

BB, 30 (emphases in original and added). A fair review of the Board's decision shows that the Board did no such thing.

The Board instead correctly determined that the specification defines "acquiring data" to require the retrieval of active data (by virtue of the express definition of "acquired data" and "its equivalents and verb forms"). Appx16. It further reasoned that there was no reason "why the recitation in claim 19 of 'acquiring' a type of data, i.e., interest data, should take on a general meaning that is divorced from the particular definition of 'acquired data' and its 'verb forms' provided in the '008 patent." Appx14, 16; *see also* Appx15 (explaining that the "view that 'acquiring interest data' constitutes a 'verb' form of 'acquired data' where the particular type of data involved is 'interest' data seemingly has merit.").

Thus, contrary to Google's assertion, the Board did not focus on the meaning of the term "acquired" and "acquiring" in isolation; instead, it correctly recognized

that "acquiring data" is a verb form of "acquired data," and thus when "acquiring data" (whether "interest data," "model data," or any other type of data), the data acquired must comprise "active data." Indeed, if the broader act of "acquiring data" (of any kind) requires the retrieval of at least some "active data," then the narrower act of "acquiring interest data" (a type of data) necessarily also requires retrieving at least some "active data."

Google also argues that "[t]he word '*acquired*,' by itself, is not defined" and that "the larger disputed claim phrase '*acquiring interest data*' is not defined either." BB, 30. In making this argument, Google carefully avoids acknowledging the fact that "acquiring data" is a verb form of "acquired data," and "interest data" is a type of data. But though Google strategically omits "acquiring data" from its argument—instead focusing on the exact terms "acquiring," and "acquiring interest data"—the fact remains that the act of "acquiring data" is clearly defined in the patent, as it is a verb form of "acquired data."

Put simply, whether the focus is on "acquiring" ("by itself," as Google alleges) or the act of "acquiring data," the indisputable facts remain the same: (1) "acquired data" and "its equivalents and verb forms" are defined to require active data; (2) the act of "acquiring data" is a verb form of "acquired data;" (3) and the claim phrase "acquiring interest data" is the act of "acquiring data" in the form of "interest data." Thus, even if Google's verbal gymnastics are entertained, they do not change the

fact that the construction adopted by the Board is correct.

*c. Google Misapplies the Law of Lexicography.*

Google also argues that "the Board employed a relaxed standard for lexicography that this Court's precedent does not support," referencing the principle that lexicography applies only when the patentee "clearly set[s] forth a definition of the disputed claim term" and "clearly express[es] an intent to redefine the term." BB, 30 (alterations in original). However, Google's position is based on its myopic view of the definition of "acquired data" and "its equivalents and verb forms," which Google irrationally refuses to accept as applying to the act of "acquiring data." Because the patentee here "clearly express[ed] an intent to redefine" the act of "acquiring data" of any kind to require the retrieval of active data, the narrower act of "acquiring interest data" (a type of data) also requires retrieving active data.

Google argues that "[a]lthough the Nobots patentee set forth ***a*** definition in the specification, that definition was for the term 'acquired data,' not the disputed word 'acquiring' or the disputed phrase 'acquiring ***interest*** data.'" *Id.* (emphasis in original). The crux of Google's argument is, because the ***exact*** phrase "acquiring interest data" is not referenced in quotes in the specification's definition, the patentee did not "clearly express an intent to redefine the term." But Google yet again ignores that the definition applies to "equivalents and verb forms" and thus the act of "acquiring data" of any type ***is*** defined. Moreover, that definition necessarily applies

to the narrower act of "acquiring interest data." The specification uniformly confirms this by using "acquired" and "acquiring" data consistent with this express definition. *Supra* Section II.A.

Nothing in this Court's precedent supports the rigid lexicographic hyper-precision and heightened standard that Google seeks to impose here. The standard for lexicography is not whether the ***exact*** phrase in a claim is defined by the specification ***using quotations***, but whether the patentee "clearly express[es] an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotations and citations omitted). This Court has long rejected requiring that a "definition of claim language in the specification be express," *Phillips*, 415 F.3d at 1321, and Google cites to no law to the contrary. Instead, it is well-established that "[e]ven when guidance is not provided in explicit definitional format, the specification ***may define claim terms by implication*** such that the meaning may be found in or ascertained by a reading of the patent documents." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d 1320-21) (emphasis added); *see also Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004) (explaining that the patentee "seems to suggest that lexicography requires a statement in the form 'I define ___ to mean ___,' but such rigid formalism is not required").

Google cannot reasonably dispute that the patentee here expressed a clear

intent to redefine "acquired data" and its verb form "acquiring data." The patentee did so in an "explicit definitional format" by defining "acquired data, ***its equivalents and verb forms***." The "exacting" standard for lexicography has been met by explicit definition. Even if that were not the case (it is), the phrase would still be defined by implication via the specification's exclusive usage of "acquire," "acquired," and "acquiring" in connection with "active data" and teaching that "acquired data ***requires*** some form of information capture means" (*e.g.*, key logger) for retrieving said "active data." Appx16 ("[I]t is 'active data' that is connected to the word 'acquired' and 'passive data' that is connected to the word 'available.'"); *see also Bell Atl. Network Servs. v. Covad Communs. Grp.,* 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

Google itself admits that "the Nobots patentee set forth ***a*** definition in the specification," though it refuses to accept the plainly stated scope of that definition as applying to the act of "acquiring data" (a "verb form" of "acquire data") where the "data" is of the interest data-type. Thus, contrary to Google's assertion, the patentee was not required to explicitly define the exact phrase "acquiring" or "acquiring interest data" in the specification—defining the phrase "acquiring data" provides more than sufficient clarity to convey that the patentee intended the act of

acquiring data of any kind (e.g., "interest data," "model data") to require the retrieval of at least some active data (e.g., using monitoring and retaining means).

*d. Google Fails to Identify Any Portion of the Specification that is Inconsistent with the Board's Construction.*

In its next bid to undermine the Board's construction, Google argues that, "[t]o the extent the definition of 'acquired data,' including its reference to 'verb forms,' creates ambiguity as to whether the word '*acquiring*' as used in claim 19 has a novel meaning in the context of the '008 patent, the specification eliminates that ambiguity because, outside of the specific defined term 'acquired data, the specification uses forms of the '*acquiring*' in accordance with the word's ordinary meaning." BB, 31. This argument fails for numerous reasons, including because the Board correctly determined that there is nothing ambiguous about whether the definition of "acquiring data" applies to "acquiring" data in the form of "interest data" in claim 19. *Supra* Section II.A.

Even if ambiguity exists, the specification amply confirms that the Board's construction is correct and that the plain meaning does not apply. As previously discussed, the specification repeatedly and consistently associates "active data" with variations of the defined term "acquire" and discusses how "acquiring" data "requires some form of information capture means"; these references mirror the express definition of "acquired data" (and "its equivalents and verb forms") and the construction of "acquiring interest data" adopted by the Board. *Supra* Section II.A.

And as the Board correctly found, the notion that data that has been "acquired" can encompass only "passive" data is "entirely absent" from the specification. Appx16.

Google's contrary argument tellingly *ignores all these teachings*. Instead, Google focuses on a single passage in isolation that discusses a "first series of embodiments" and "second series of embodiments:"

> In a first series of embodiments, a comparison between interest data, ***acquired*** prior to delivery of issued data to the client computing device, and model data is performed to ascertain the likely status of the client computing device, i.e., human user or bot 130, 420. In a second series of embodiments, a comparison between monitored data, by definition ***acquired*** after delivery of issued data to the client computing device, and model data is performed to ascertain the likely status of the client computing device, i.e., human user or bot 130, 420. In both series of embodiments, acquired and/or available data may be used for comparison with suitable model data.

Appx60 (3:47-60) (emphasis added). Google argues the "first series of embodiments" supposedly "aligns with what claim 19 recites" and the "second series of embodiments" supposedly "aligns with claim 1." BB, 31-32.[4] This is demonstrably incorrect. Claim 1 does not use any form of the word "acquire," and the language of claims 1 and claim 19 are vastly different than the language used to describe the first and second series of embodiments, respectively.

[4] Google represented to the Board that that "the first series" and "the second series" of embodiments "matches" the steps of claims 19 and 1, respectively. Appx1380. Apparently recognizing that this is false, Google now vaguely alleges that they "align," despite the claim language being vastly different than the language used to describe the two series of embodiments.

Even if the claim language was "aligned" with the two series of embodiments, it would not demonstrate that the specification refers to "acquired" data inconsistent with the express definition. Google falsely presumes that "the passage places no limit on what type of 'interest data' … or 'monitored data'" is "compared with model data." BB 32-33. This is demonstrably incorrect—the interest data and monitored data discussed is "acquired," so the passage ***does*** limit the type of interest data and monitored data. Where interest data or monitored data is "acquired," that acquired data necessarily includes at least some active data. *See* Section II.A, *supra*. This is because specification clearly defines "acquired data" of any kind (and "its equivalents and verb forms") to require "active data." *Id.*

The only basis for Google's contrary assertion that this passage uses "acquired" in accordance with its ordinary meaning is Google's unsubstantiated say-so. BB, 32-33 (arguing that the two series of embodiments "uses 'acquired' in its ordinary sense., *i.e.*, retrieved" and that "[o]n its face, the passage places no limit on what type of 'interest data' [or 'model data'] is compared with the model data"). Google's argument is premised on circular logic—first falsely assuming that the reference to "acquired" interest data and model data carries its "ordinary meaning," and then relying on that false assumption as evidence that Google's construction is correct. As already discussed, however, the specification clearly defines "acquired data" and "its equivalents and verb forms" to require "active data." Just as it is

improper to view the claim language divorced from the specification, it is equally improper for Google to view this single passage in isolation from the remainder of the specification, which informs the meaning "acquired data" and "its equivalents and verb forms."

Google ultimately fails to provide even one reason why the references to "acquired" interest data and "acquired" model data in the passage above are inconsistent with the explicit definition of "acquired data" and "its equivalents and verb forms." Nor can it. Both "interest data" and "monitored data" are described as "compris[ing] ***active*** or passive data." Appx60 (3:41-46) (discussing "interest data"); *Id.* (3:37-41) (discussing "monitored data"). The discussion of each being "acquired" in those series of embodiments is therefore entirely consistent with the understanding that the interest and monitored data in these embodiments must comprise at least some active data. This understanding aligns with how the "interest data" that is "acquired" in claim 19 must comprise active data, just as all other "acquired" data in the specification is described as comprising active data.

Google relies on the last sentence from the isolated passage above as allegedly "confirming" that the phrase "acquiring interest data" must be viewed in a manner divorced from the express definition: "In both series of embodiments, acquired and/or available data may be used for comparison with suitable model data." *Id.* (3:58-60). Google's reliance is misplaced. This sentence does not support Google's

position; rather, it supports the Board's construction.

Google argues that this final sentence means that the "interest data" or "monitored data" described at lines 3:48-58 of the passage could consist of solely available data (i.e., passive data); and if that's the case, Google says, the Board is wrong that any data "acquired" requires active data. BB, 34. But Google misreads what this final sentence is saying. This final sentence merely teaches that *additional* data, whether "acquired and/or available," *could be* ("may be") used in those embodiments. It does not mean that the "acquired" interest or monitored data described in lines 3:48-58 of the passage is "acquired and/or available" data. In other words, the sentence does not say that the "acquired and/or available data" ***is*** the "acquired" monitored data or "acquired" interest data previously referenced in the first two series of embodiments.

In fact, the final sentence would be redundant if the "acquired" interest data and monitored data from the "first series" and "second series" of embodiments already broadly encompassed "active and/or passive" data as Google contends. The final sentence instead teaches that, rather than using "acquired" interest data ("first series of embodiments") or "acquired" monitored data ("second series of embodiments") for comparison purposes, additionally and/or in the alternative "acquired and/or available data" ***could also be*** ("may be used") for comparison purposes. In other words, the relied-on statement simply makes clear that there are

alternative embodiments where "acquired" and/or "available" data may be used for comparison, and not necessarily just "acquired data" as expressly stated with respect to the first and second series of embodiments. Indeed, if the final sentence was not conveying additional embodiments, there would be no "first ***series*** of embodiment**s**" (**plural**) and "second ***series*** of embodiment**s**" (**plural**), but only a "first embodiment" and "second embodiment." Consequently, Google's reliance on the "first series" and "second series" of embodiments as somehow undoing the specification's explicit definition is misplaced.

Google falsely contends that its arguments on the "two series of embodiments" were "ignored" by the Board. BB, 34. Yet the Board explicitly "considered Petitioner's views to the contrary **(*see, e.g.*, Pet. Reply 21–25)** but find them unavailing." Appx16 (bold emphasis added). Indeed, pages 22 to 24 of Google's IPR Reply Brief included the same arguments. Appx1379-82. Further, during oral arguments the Board had several exchanges with Google's counsel regarding those arguments. Google admitted that the only portion of the specification it could point to that purportedly undermines the Board's construction is column 3, lines 47-60 (the "two series of embodiments" passage). Appx2107-8 (15:22-16:5). The Board then asked Google's counsel about the final sentence referring to the series of embodiments: "Is there another way of reading that sentence that it is just talking about the fact that perhaps available data is available ***but not necessarily***

***acquired in the first embodiment***?" Appx2108-9 (16:18-17:6) (emphasis added). The clear implication of this question is that the Board understood that the final sentence does not say that the previously "acquired" data can be available data, but simply discloses additional embodiments that are not limited to comparing model data with acquired data. Google's contrary reading of this sentence is premised on its partisan bias and predisposition to undo the express definition relating to "acquiring data."

Recognizing that its arguments on the "two series of embodiments" lacks merit, Google resorts to arguing that "other portions of the specification" relating to the term "available" somehow affects the construction of the term "acquiring interest data." BB, 35. As an initial point, any inconsistency between the specification's use of the term "available" with the express definition of "available data" is irrelevant to the dispute about the completely different definitional term at issue here "acquired data, its equivalents and verb forms." Even assuming that the specification does in a single instance use the term "available" in a manner inconsistent with the express definition of "available data," Google fails to provide a single example of the specification doing the same with respect to "acquired." In other words, even if the patentee expressed a clear intent to deviate from the meaning of "available data" in one instance, the patentee did not express any such intent with respect to the term at issue here—"acquired data" and "its equivalents and verb forms."

To the contrary, the specification repeatedly uses the term "acquire" (and variations thereof) to refer to data comprising active data and the retrieval of active data, consistent with the express definition. This is true even when the exact phrase "acquired data" is not used. *See, e.g.,* Appx60 (4:6-7) (using "*acquiring* data" in accordance with the definition); Appx59 (2:18-21) (discussing "*acquired* and/or available data" in accordance with its definition); *Id.* (2:60-65) (discussing "data *acquired*" in accordance with definition); Appx60 (3:48-50) (discussing "interest data, *acquired*…" in accordance with the definition).

Google ultimately fails to identify a single instance in the specification where the patentee clearly intended to deviate from the express definition of "acquiring data." Indeed, the patentee used terms other than the defined term "acquiring" data, such as "received," "obtained," "collected," when there was an intent to more broadly refer to the retrieval of *any* data. But in claim 19, the patentee adhered to the expressly defined act when it wrote, "*acquiring* interest data." Nor can any supposed ambiguity in the specification undo the clear, explicit definition of "acquiring data." In other words, given that the act of "acquiring data" is clearly defined to require the retrieval of active data, and given that Google has failed to demonstrate any inconsistent usage of the term "acquired" (including its equivalents and verb forms) elsewhere in the specification, Google cannot plausibly show that the patentee did not intend for the explicit definition to apply to the claim.

*e. <u>Google's Claim "Re-Writing" Theory is Improper and Wrong.</u>*

Absent exceptional circumstances, "federal appellate courts do not consider issues not passed upon below or entertain arguments not presented to the lower tribunal." *See Hylete LLC v. Hybrid Ath., LLC*, 931 F.3d 1170, 1174 (Fed. Cir. 2019) (internal quotations and citations omitted). Consistent with this principle, the Federal Circuit "generally do[es] not consider arguments not raised to the Board." *See Bozeman Fin. LLC v. Federal Rsrv. Bank of Atlanta*, 955 F.3d 971, 974 (Fed. Cir. 2020). Despite this clear precedent, Google tries to undermine the Board's ruling based on a theory and arguments that it clearly could have presented below but did not. Specifically, Google argues for the first time on appeal that the Board's construction must be wrong because it allegedly "leaves open the possibility that the phrase would allow for the retrieval of some passive data too so long as that passive data was retrieved along with the active data" and the Board "effectively re-wrote the claim" based on a convoluted theory tied to the claim terms "interest data" and "model data." BB, 36-39. Nothing even remotely resembling this theory or arguments was presented to the Board by Google. *Compare id. with* Appx1377-1384.

Nor is there any reason these arguments could not have been raised before the Board. Google was aware of Nobots's proposed claim construction as of the filing of Nobots's Preliminary Response, and Nobots maintained that same construction

in the Patent Owner Response and Sur-Reply. Appx870-73; Appx1220-29. The Board itself stated that Nobots's construction "seemingly has merit" in the Institution Decision. Appx1180. Google thus knew the phrase "acquiring interest data" was in dispute and that Nobots's position was that the term would be understood to require "the retrieval of some active data." Google presented the Board with multiple arguments and theories in an effort to disprove that exact claim construction, none of which are even vaguely similar to these new arguments about improperly "re-writing the claims."

Given that these arguments could have been presented to the Board with Google's other attacks, the failure to present them to the Board constitutes forfeiture. *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020) ("Google's failure to raise its lexicography arguments, inadvertent or not, compels a finding of forfeiture."); *Netflix, Inc., v. DivX, LLC,* No. 2021-1931, 2022 U.S. App. LEXIS 17573, *19-20 (Fed. Cir. 2022) (determining petitioners' argument "is different on appeal from the argument they raised before the Board" and "that argument was raised for the first time on appeal and is therefore forfeited"); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) ("Our precedent generally counsels against arguments not presented to the district court" and that it would be "unfair" to allow a party to raise some arguments with the lower tribunal "and then, only after those arguments have been completely rejected, bring

entirely different arguments on appeal for the first time.").[5]

Even if extraordinary circumstances were present to justify finding no forfeiture (none are present), Google's new theory is meritless. Google argues that the phrase "of some active data" in the Board's construction "seemingly leaves open the possibility that the phrase would allow for the retrieval of some passive data too so long as that passive data was retrieved along with active data," further arguing that the construction should require "the retrieval of active data alone, ***and does not permit the retrieval of passive data***." BB, 36 (emphasis added). In other words, Google is asking the Court to read claim 19 as imparting a negative limitation that prohibits any "passive data" from being retrieved, even if "active data" is retrieved as required by the act of "acquiring interest data." This Court should reject Google's belated attempt to narrow the claim.

There is no basis in the Board's construction, the explicit definition of "acquired data, its equivalents and verb forms," or the plain language of the claims, for interpreting the claim to only allow for "the retrieval of active data alone" while also reading in the negative limitation "not permit[ting] the retrieval of passive data." While "acquiring interest data" requires the retrieval of active data, it does not

[5] This Court's precedent shows that the term "waiver" and "forfeiture" have been used interchangeably. *In re Google Tech. Holdings, LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020). However, "forfeiture is the failure to make the timely assertion of a right, [whereas] waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* Thus, forfeiture appears to be the applicable doctrine here.

preclude additional data (e.g., passive data, model data) from also being retrieved.

Google mischaracterizes the following statement from the Board as suggesting that "acquiring interest data" precludes "passive data" from being retrieved *in addition to* the "active" data:

> In that regard, consistent with the remainder of the Specification of the '008 patent, it follows that the noted sentence does not alter the contours of "acquired" data ***to also encompass "passive" data*** where that premise is entirely absent from other portions of the Specification.

Appx16 (emphasis added). However, context matters. This statement is part of a larger discussion by the Board responding to Google's argument that the term "acquired" is used in the specification to refer to the retrieval of *only* passive data. Appx16-17. The Board was explaining why it was rejecting Google's broad interpretation of "acquiring interest data" as encompassing retrieving *only* passive data (i.e., with no active data). When read in context, it is clear that the Board did not say or even suggest that "acquiring interest data" precludes the retrieval of other data (e.g., passive data) in addition to the retrieval of active data. In fact, the adopted claim construction makes it explicitly clear—by virtue of the adopted language "*some* active data"—that the Board did not interpret claim 19 in that narrow manner.

Given that the rest of Google's newly raised arguments hinge on the incorrect notion that claim 19 does not permit the retrieval of passive data, they necessarily fail. BB, 37-38. Even if there were merit to that position (there is none), the remaining arguments would still be wrong. Google argues that, ***if*** the Board

interpreted "acquiring interest data" to mean "retrieval of active data alone," then the Board improperly re-wrote "acquiring interest data" to recite "acquiring data." But even under that narrow reading of the Board's construction, the construction would not eliminate the distinction between interest data and active data.

The specification defines "interest data" as follows:

> "interest data", its equivalents and verb forms comprises active or passive data, whether available or acquired, that *correlates to any data within model data*, whether obtained prior to or after the generation of issued data. Thus, interest data includes time independent available data and acquired data, unless qualified differently.

Appx60 (3:41-46). Thus, "interest data" comprises data that "correlates to any data within the model." Assuming "acquiring interest data" required the retrieval of interest data consisting of "active data alone" (as Google wrongly alleges), the interest data would still have to satisfy all *other* requirements of the express definition of "interest data." For example, "interest data" "correlates to any data within model data," whereas Google points to no definition in the specification that requires the same of "active data." There is thus a clear distinction between "active data" and "interest data" consisting of "active data."

Nor is Google correct in saying that the patentee's decision to recite "comparing the interest data to model data" in claim 19, rather than "comparing the interest data to <u>active</u> model data," means that the phrase "acquiring interest data" must not have been intended to require the retrieval of interest data comprising

"active data." The fact that the claim requires the retrieval of interest data comprising active data has no bearing on the *separately* claimed "model data." If anything, the fact that the "model data" more broadly encompasses both "active model data" and "passive model data" evidences that "acquiring interest data" was not intended to be limited to retrieving interest data consisting of "active data alone."[6] Rather, claim 19 as written requires the retrieval of interest data comprising active data; but claim 19 does not preclude the additional retrieval of passive data that can be compared to the model data. Because the Board's construction is consistent with this understanding, the Board has not engaged in impermissibly rewriting the claims.

### 3. Google's Reliance on Claim 20 Is Improper and Incorrect.

Google argues that the Board erred in concluding that (consistent with claim 20's express language) claim 20 depends from claim 1. BB, 39-42. Google instead seeks to rewrite claim 20 to depend from claim 19. It then argues that such reordering of the dependencies supports its construction of the term "acquiring interest data" in claim 19. This argument has not only been waived on appeal—it is also wrong.

#### *a. Google Waived Any Appeal of Claim 20's Dependency.*

Google has not appealed the Board's determination that claim 20 is invalid

[6] Contrary to Google's arguments, claims 2 and 4 are completely irrelevant to the meaning of "acquiring interest data" in claim 19. As Google admits, claims 2 and 4 depend from "a different independent claim" (i.e., claim 1), not independent claim 19. BB, 38. Thus, Google's bizarre claim differentiation-like argument has no merit.

based on the combination of Willner and Kitts, nor has Google appealed the Board's determination that claim 20 depends from independent claim 1. Instead, the only issues on appeal are the construction of "acquiring interest data" in claim 19 and whether that claim is anticipated by Kitts. BB, 6 (Statement of Issues); *Id.* at 46 (Google's conclusion merely requesting that the "finding that claim 19 was not proven unpatentable should be reversed"). Consequently, there is a nonappealable final ruling from the Board that claim 20 depends from claim 1 and that claim 20 is invalid based on the combination of Willner and Kitts under that construction.

Having benefited from a nonappealable invalidity ruling under that construction, Google now asks the Court to adopted a contradictory construction for claim 20 in an effort to invalidate claim 19. As the saying goes, however, Google cannot have its cake and eat it too. Google is precluded from benefitting from the Final Written Decision's invalidation of claim 20 based on Willner and Kitts, and then turning around and asking this Court to adopt a contrary claim construction to invalidate claim 19. Having chosen to not appeal the Board's ruling with respect to claim 20, Google is bound by that ruling and the underlying construction adopted by the Board. Google cannot advance a contrary theory.

b. *The Board Correctly Concluded that Claim 20 Depends from Claim 1.*

Even if the Board's decision is reviewed on the merits, the construction should be affirmed. Google acknowledges that claim 20 expressly depends from

independent claim 1, but argues that it should be rewritten to depend from claim 19 because "the interest data" lacks antecedent basis. The Board correctly concluded, however, that Google's "view rests on speculation by both [Google] and Dr. Lopresti" and that "the evidence of record more readily supports [Nobots's] view that claim 20 should be regarded as depending from claim 1, as written." Appx12.

As an initial matter, Google took a contradictory position in the underlying litigation. While Google now alleges that claim 20 includes an "obvious typographic error" with a clearly understood meaning, in the litigation Google argued that claim is indefinite:

| | | | |
|---|---|---|---|
| 11 | "The method of claim 1 wherein the interest data consists of available data." | '008 claim 20 | Indefinite |

Appx1017 (Google's proposed claim constructions). In other words, Google asserted that a person having ordinary skill in the art ("PHOSITA") could not determine the scope of claim 20 with reasonable certainty because of the lack of antecedent basis. It was only *after* Google appreciated the significance of its failure to account for the definition for "acquiring data" that Google changed its position, alleging for the first time that claim 20 is not indefinite but instead "obviously" intended to depend on claim 19.

Even setting these inconsistent positions aside, Google is wrong on the merits because a PHOSITA would understand claim 20 to depend on claim 1 as expressly

stated. Appx1295-96 (¶ 68). The patentee made clear during prosecution that claim 20's reliance on independent claim 1 was intentional. Appx1296 (¶ 69). Specifically, in attempting to overcome an office action rejection, the patentee represented:

> **Claims 3-19 and 21 ultimately *depend from independent claim 2***. As discussed above, amended claim 2 is not anticipated by Sundstrom, and is therefore allowable over the cited document. Therefore, **claims 3-19 and 21 are also allowable over the cited document of record for at least *their dependency from an allowable base claim***, and also for the additional features that each recites. Accordingly, Applicant respectfully requests that the Office withdraw the§ 102 rejection of claims 3-19 and 21.

Appx291-92. The referenced "independent claim 2" ultimately issued as independent claim 1 and the referenced "claim 21" ultimately issued as dependent claim 20. *Compare* Appx284 (referenced "independent claim 2") *with* Appx61 (issued claim 1); *Compare* Appx288 (referenced "claim 21") *with* Appx61 (issued claim 20). Thus, a PHOSITA would understand the patentee to have expressed a clear intent for dependent claim 20 to depend from independent claim 1. Appx1296 (¶ 69).

Google attempts to dismiss this evidence as irrelevant because "[a] repeated mistake is a mistake, nonetheless." BB, 41-42. Google misses the point. The fact that the patentee clearly stated that claim 20 was intended to depend on claim 1, outside the draft claims themselves, is indisputable evidence that the dependency was ***not*** a mistake. This is not a matter of an identical claim error being duplicated throughout the draft claims during prosecution, but rather an express statement in an

office action response (not merely in draft claims) articulating the patentee's intent. In contrast, Google has no evidence to supports its speculative theory that the patentee inadvertently omitted a "0"—a theory undermined by the patentee's later statement that the claim dependency was intentional. In fact, Google's preliminary assertion that claim 20 was indefinite also shows that, at least initially, Google had doubts as to whether the construction it proposes now is correct.

The Board did not err in determining that claim 20 depends from claim 1. The Board considered both parties' positions, reasoning that:

> [Nobots's] assessment of the prosecution history (buttressed by Dr. Russ's declaration) provides a credible basis for concluding that claim 20 should be understood as depending from claim 1 in the matter that it is written, even with the unconventional circumstance of intervening independent claim 19 and the antecedent concern in referring to "interest data." As Patent Owner notes, the record reflects that during prosecution, Patent Owner actively grouped pending claims 3–19 and 21 together as being dependent on pending "independent claim 2," which ultimately became independent claim 1 in the '008 patent. Pending claim 21 became claim 20 in the '008 patent and was presented as being dependent on independent claim 1.

Appx11-12 (internal citations omitted). The Board further determined that Google's position "rests on speculation by both Petitioner and Dr. Lopresti that an unintended typographical error occurred in the drafting of proposed claim 21 that became claim 20 of the '008 patent, and was maintained during prosecution." Appx12. Thus, the Board not only assessed the prosecution history and the parties' arguments, but also relied on Dr. Russ's testimony as credible while determining that Dr. Lopresti's

testimony was purely speculative.

The Board's determination should thus be affirmed. This is particularly so because the Board's finding here is supported by substantial evidence, including the testimony of Dr. Russ. *See Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1133 (Fed. Cir. 2018) ("Any underlying factual findings that draw on extrinsic evidence, such as dictionaries or treatises ***or expert testimony***, are reviewed for support by substantial evidence in the record."); *Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*, 878 F.3d 1336, 1341 (Fed. Cir. 2018) ("If two 'inconsistent conclusions may reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'") (alterations in original) (citing *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016) (internal quotation and citation omitted)). Indeed, the Board was required to reject Dr. Lopresti's speculative testimony because the prosecution history contradicts it. *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1379 (Fed. Cir. 2016) ("Legal error arises when a court relies on extrinsic evidence that contradicts the intrinsic record.").

As Nobots further argued to the Board, given that claim 20 depends from independent claim 1, a PHOSITA would understand that "the *interest* data" referenced in claim 20 was intended to refer to "the *model* data" of claim 1. Appx1297 (¶ 70). Specifically, the patent explains that "'interest data', its

equivalents and verb forms comprises active or passive data, whether available or acquired, ***that correlates to any data within model data,*** whether obtained prior to or after the generation of issued data." Appx60 (3:41-45). Further, as that definition reflects, "interest data" comprises "available" data or "acquired" data—both defined terms. *Id.* (3:18-33). Thus, a PHOSITA would understand that claim 20 further limits "the model data" of claim 1 to consisting of "available data," which is "a type of passive data." Appx1297 (¶ 70). This interpretation follows the drafting of dependent claim 4, which further limits "the model data" to comprising "passive model data." *Id.* Consequently, the evidence supports the Board's conclusion that the error does not lie in the dependency of claim 20, and thus no reason exists to re-write the claims as proposed by Google.

*c. Google's Claim Dependency Arguments Lack Merit.*

Google's remaining arguments are equally unavailing. For instance, it is irrelevant that construing claim 20 to depend from claim 19 is allegedly consistent with the definition of "interest data" and claim differentiation, because correcting "the *interest* data" to refer to "the *model* data" is also consistent with the specification and claim differentiation. More specifically, the specification describes "model data" as encompassing "*passive* model data" (Appx59-60 (2:54-60, 3:9-17)) and the interest data of claim 20 "consists of available data," which is a type of "*passive* data" (Appx60 (3:18-24)). Thus, interpreting "the interest data" in claim 20

to refer to “the model data” is consistent with the specification and the principle of claim differentiation, because claim 20 would then further limit the “model data” of claim 1 to consisting only of “available data” (*e.g.*, browser cookies).

Google further argues that construing claim 20 as depending from claim 19 “also matches the specification’s language.” BB, 40 (citing Appx60 (3:48-60)). The portion of the specification relied on by Google is the same portion discussing the “series of embodiments,” which Google misconstrues to undermine the express definition of “acquiring data.” *Supra* Section II.B.2.d. Regardless, reading “the *interest* data” of claim 20 to refer to “the *model* data” is wholly consistent with the specification for the reasons discussed above. In other words, even if the specification was consistent with Google’s proposed correction, the specification is equally consistent with Nobots’s construction. Thus, the specification provides no greater support for Google’s position than for the position of Nobots.

Google misrepresents that “the Board sidestepped Google’s claim dependency argument by reading claim 20 as dependent from claim 1.” BB, 41. Yet, the Board provided a detailed analysis explaining exactly why Google’s position on the dependency of claim 20 is wrong. Appx10-12.

Google also complains that “[t]he Board did not directly resolve the antecedent basis issue, but seemingly endorsed Nobots’s argument” that “the interest data” would be understood to refer to “the model data.” BB, 41. This too is false. In

the Petition, Google expressly requested that the Board invalidate claim 20 as depending from claim 1 based on the combination of Willner and Kitts, ***without construing*** the claim to address the lack of antecedent basis for "the interest data." Appx165-66. Aside from arguing that there was a lack of motivation to combine and a lack of reasonable expectation of success, Nobots did not challenge this application of Willner and Kitts to dependent claim 20. Appx39 ("Patent Owner does not appear to offer any explicit challenges pertaining to claim 20, but Patent Owner's view that Petitioner has not shown an adequate motivation to combine Willner and Kitts or a reasonable expectation of success in doing so seemingly also applies to claim 20."). The Board then applied claim 20 ***exactly as Google requested*** to determine that Willner and Kitts render that claim obvious. *Id.* Google explicitly acknowledges this fact in its brief. BB, 41 n.10. Thus, contrary to Google's representation, the Board did not adopt Nobots's interpretation that "the interest data" refers to "the model data"—it was unnecessary for the Board to do so given that Nobots did not challenge Google's mapping to, and application of, claim 20 to the combination of Willner and Kitts.

Google argues that it is an "unreasonably strained reading" to view "the interest data" of claim 20 as referring to "the model data." BB, 41. However, that the patentee inadvertently claimed "the *interest* data" rather than "the *model* data" (as already recited in claim 1) is no less "reasonable" than Google's assertion that

the patentee intended to depend on claim 19 rather than claim 20. Indeed, as discussed, reading "the interest data" as "the model data" fully comports with the specification.

d. *At a Minimum, a Reasonable Debate Exists as to the Nature of the Error in Claim 20.*

Google's claim construction position also fails because it relies on a fundamental misunderstanding of the scope of the Board's authority to correct alleged typographical errors. While the Board may correct such errors, Google's cited cases demonstrate that such a correction can only be made where there can be ***no reasonable debate*** over the nature of the error. *See Pavo Sols. LLC v. Kingston Tech. Co.,* 35 F.4th 1367, 1373, 1376 (Fed. Cir. 2022) (finding correction appropriate under no "reasonable debate" standard); *See Fitbit, Inc. v. Valencell, Inc.,* 964 F.3d 1112, 1119-20 (Fed. Cir. 2020) (finding "conspicuous" and undisputed error to be correctable). Indeed, in *Fitbit* both parties ***agreed*** as to the error and its correction, and the Federal Circuit found the correction to be appropriate because it "perceive[d] no debate." *Id.* at 1120.

Here, there is no such agreement. The prosecution history demonstrates that Nobots's position is correct. But at a minimum, there is a reasonable debate about the nature of the purported error in claim 20. On one hand Google contends (based solely on speculation) that claim 20's dependency on claim 1 was an error intended to depend on claim 19, while Nobots contends (based on unambiguous intrinsic

evidence) that the dependency on claim 1 was intentional and that the error lies in the lack of an antecedent basis for the phrase "the interest data" in claim 20. In fact, Google itself previously suggested that another potential correction was reading "the *interest* data" as "the *monitored* data" of claim 1. Appx1383. It also has argued that claim 20 was simply indefinite in its proposed claim constructions. Appx1017.

Given that the nature of the error is at a minimum subject to reasonable debate, the Board did not err by refusing to construe the claim as proposed by Google and instead proceeding to apply the combination of Willner and Kitts to claim 20 as depending on claim 1 as written. This was an interpretation of claim 20 and a ground of invalidity ***expressly advanced by Google in the Petition***. *See* Appx134 (ground 2), Appx165-66 (arguing that claim 20 as written is invalid based on the combination of Willner and Kitts).

*e. Claim 20 Cannot Change the Meaning of Terms in Claim 19.*

Google argues that, "[o]nce dependent claim 20 is construed to depend from independent claim 19, it unequivocally confirms the error in the Board's construction." BB, 40. Google puts the cart before the horse; rewriting claim 20 to depend from claim 19 is improper as discussed above. Regardless, this Court has held that that "the language of a dependent claim ***cannot*** change the scope of an independent claim whose meaning is clear on its face." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1360 (Fed. Cir. 2016)

(emphasis added). "While it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive. **The dependent claim tail cannot wag the independent claim dog**." *Id.* (emphasis added) (quoting *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993)). Consequently, even if claim 20 had been written to depend on claim 19, that would not change the fact that "acquiring interest data" requires the retrieval of active data pursuant to the patent's explicit definition. *See Kruse Tech. P'ship v. Volkswagen AG,* 544 F. App'x 943, 952 (Fed. Cir. 2013) ("This court will not redraft claim 1 contrary to its ordinary meaning to avoid a conflict with [dependent] claim 4."). If anything, that would mean that claim 20 is indefinite—irrelevant given that the claim has already been found invalid based on the prior art.

**4. Google's Reliance on Nobots's Preliminary Infringement Contentions is Misplaced and Misleading.**

Google argues that a patentee is bound by its preliminary contentions and that the preliminary infringement contentions served by Nobots are inconsistent with the Board's construction of "acquiring interest data." Google is wrong on both counts.

*a. Google Mischaracterizes the Law*

There is no support in the law for Google's contention that a patentee's claim construction is bound by *preliminary* infringement contentions. While Google quotes *Data Engine Techs. LLC v. Google LLC* out-of-context, those facts are

inapposite. In *Data Engine*, a claim construction was ***adopted*** by the Federal Circuit at the insistence of the patentee for purpose of validity, but the patentee later took an inconsistent claim construction before the Federal Circuit for purposes of infringement. *See Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021) (chastising patentee for successfully urging the Federal Circuit to deem the preamble limiting for purposes of validity under § 101 in an earlier appeal, while in the current appeal urging the Federal Circuit to deem the preamble non-limiting). As this Court explained there, "where . . . a patentee relies on language found in the preamble to ***successfully*** argue that its claims are directed to eligible subject matter, it cannot later assert that the preamble term has no patentable weight for purposes of showing infringement." *Id.* Thus, in *Data Engine* a construction was successfully ***adopted*** at the behest of the patentee, but the patentee later sought a contradictory construction.

*Data Engine* is irrelevant to this case for at least two reasons. First, Nobots did not take an inconsistent claim construction position as explained below. Second, Nobots's allegedly inconsistent position was not "successfully adopted," but was instead—at most—part of *preliminary* contentions that are by their very nature subject to change "in light of discovery, invalidity, prior art, claim construction." Appx1072 (cover pleadings to preliminary infringement charts). Google is certainly aware of the nature of "preliminary" contentions—Google proposed that claim 20 is

"indefinite" in its *preliminary* claim constructions in the litigation but now takes a different position in these proceedings by arguing that claim 20 would unequivocally be understood to depend on claim 19. *Compare* Appx1017 (Google's proposed claim constructions) *with* Appx1382 (Google IPR reply brief); *See also* Appx10 (the Board noting that Google's reply brief is "more [un]equivocal [*sic*] in its belief that claim 20 should be interpreted to depend from claim 19") (alteration added).

Thus, there is nothing untoward about a party reconsidering or reevaluating its preliminary positions. *Data Engine* does not support the proposition that a patentee is bound to its *preliminary* infringement contentions, just as it does not mean that Google is bound to the indefiniteness position from its *preliminary* claim constructions.

b. *Nobots's Preliminary Infringement Contentions are Consistent with the Board's Claim Construction.*

Nobots never argued in its preliminary contentions (implicitly or explicitly) that "acquiring interest data" could be satisfied without retrieving "active data." To the contrary, Nobots explained that the specification teaches that "interest data" may include "***active*** or passive data"—Nobots never stated it was alleging infringement based on the retrieval of passive data alone. Appx66. While Nobots identified "browser cookies, the user agent of the browser, and/or one or more IP address" as part of the claimed "interest data," Nobots **also** identified active data as well. Appx1914. For example, Nobots explained that "[t]he use of other interest data …

is further demonstrated by the descriptions below," which references active data in the form of "user's cursor movements." *See* Appx1916 (identifying portion of publicly available material stating "most of the time the **user's cursor movements** … are conclusive enough"). As another example, Nobots explained that "before Google sends back a CAPTCHA in reCAPTCHA v2 Checkbox, for example, certain signals are transmitted to Google," in specific reference to a Google image identifying "**User Interaction**" (e.g., mouse movement, keyboard strokes) as being part of the "signal." Appx1915. Nobots thus pointed to both "passive" and "active data," but never took the position that retrieving passive data *alone* could satisfy claim 19.

In fact, for the mappings to claim element 19[b] (reciting "comparing ***the interest data*** to model data"), Nobots referred to the mappings for claim 1[d]. Appx1917. Those referenced mappings explain in detail how the "active data" (e.g., mouse movements) contained within the "interest data" is compared to "model data." *See generally* Appx1864-1870; *see* Appx1865 (explaining that "when the user clicks on the checkbox, a POST request with an obfuscated payload that contains the ***event listener data*** is transmitted to Google"); Appx1862 (explaining that "event listeners" are what allow Google to track "keyboard, mouse, touch, scroll and resize events" of the client computing device). Nobots's preliminary infringement contentions thus fully align with the correct construction of "acquiring interest data"

as requiring the retrieval of at least some active data (with or without passive data).

Indeed, Google fails to identify any portion of the contentions where Nobots alleged that the claimed "interest data" includes *only* passive data. Google instead cherry-picks portions of the contentions referencing passive data, while ignoring the portions that undermine its assertion by referencing "active data." BB, 43.

Google also alleges that the portion of Nobots's preliminary contentions addressing dependent claim 20 demonstrate that "acquiring interest data" may include only "passive data." *Id.* at 44. First, Google never made this argument before the Board or even cited Nobots's mappings to claim 20. *See* Appx1378 (relying only on Nobots's preliminary contention mappings to claim 19 in support of its construction for "acquiring interest data"); Appx1382-1384 (never mentioning Nobots's preliminary contentions in arguing that claim 20 depends from claim 19). Google thus forfeited this argument on appeal. *See In re Google Tech. Holdings LLC*, 980 F.3d at 863 ("Google's failure to raise its lexicography arguments, inadvertent or not, compels a finding of forfeiture.").

Even if considered, this argument lacks merit. Google states that "Nobots treated the dependent claim as depending from claim 19," but again omits the portions of the contentions that undermines its assertion: "Each of the Accused Methods comprises assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than an

autonomic computer application based on interest data in the manner set forth in Claim 19. ***See also Claim 1***.” Appx1922. Thus, Nobots expressly referred to its mappings from claim 1 with respect to claim 20. While Nobots did refer to claim 19, that does not mean that Nobots was interpreting claim 20 to depend on claim 19. It simply means that Nobots was relying on the same ***disclosures*** mapped to claim 19 to support that claim 20 is satisfied by the accused products.

*c. The Correct Construction Must Be Adopted Regardless of the Parties' Preliminary Positions.*

The Court should adopt “the correct construction” regardless of what each party is alleged to have previously argued—“The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.” *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). That is precisely why the Board's claim construction for “acquiring interest data” must be affirmed: It is the only construction that aligns with the specification's defined act of “acquiring data” and the repeated and exclusive use of various forms of “acquire” to refer to “active data.”

Google's argument to the contrary—that “acquiring interest data” is being used to simply refer to the “retrieval” of interest data—is vitiated not only by these express definitions and the specification's consistent usage of various forms of “acquire,” but also by the fact that the patentee used *other* terms when it intended to

broadly claim the retrieval of *any* data, such as "collecting," "receiving" and "obtaining." Appx59 (2:54-58) (discussing data "***received*** by a computing device"); Appx60 (3:38-41) (discussing data that can be "***obtained*** from the computing device"); *Id.* (3:41-44) (explaining that data may be "***obtained*** prior to or after the generation of issued data"); Appx58 (Fig. 4, element 410) (stating that "[a]ctive or passive data ***collected*** is compared with stored model data").

## III. CONCLUSION

For the reasons set forth above, Nobots respectfully requests that this Court AFFIRM the Board's decision that Google failed to demonstrate unpatentability of claim 19 by a preponderance of the evidence.

August 26, 2024

Respectfully submitted,

/s/ *Stephen D. Zinda*
Stephen D. Zinda
James Hall
CABELLO HALL ZINDA, PLLC
801 Travis Street, Suite 1610
Houston, TX 77002
Tel: 832-631-9990
Fax: 832-631-9991

***Counsel for Appellee Nobots, LLC***

## CERTIFICATE OF COMPLIANCE

This brief complies with (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,655 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. App. P. 32(b), as calculated by Microsoft® Word for Microsoft 365; and (2) the typeface requirements of Fed. R. App. 32(a)(5)(A) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365. The font size is 14, and the font is Times New Roman.

/s/ *Stephen D. Zinda*
Stephen D. Zinda

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Responsive Brief of the Appellee with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on August 26, 2024. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Stephen D. Zinda*
Stephen D. Zinda