**2024-1432**

# United States Court of Appeals for the Federal Circuit

**GOOGLE LLC,**
*Appellant*

v.

**NOBOTS LLC,**
*Appellee*

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2022-00940**

## REPLY BRIEF OF APPELLANT GOOGLE LLC

Nathan R. Speed
Elisabeth H. Hunt
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1432

**Short Case Caption** Google LLC v. Nobots LLC

**Filing Party/Entity** Google LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/16/2024

Signature: /s/ Nathan R. Speed

Name: Nathan R. Speed

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Google LLC | | XXVI Holdings Inc.; Alphabet Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Wolf, Greenfield & Sacks, P.C. | Adam R. Wichman | |
| Wolf, Greenfield & Sacks, P.C. | Richard F. Giunta | |
| Wolf, Greenfield & Sacks, P.C. | Hunter Keeton | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i
TABLE OF CONTENTS ................................................................................ ii
TABLE OF AUTHORITIES ........................................................................ iii
INTRODUCTION ........................................................................................ 1
ARGUMENT ............................................................................................... 4
A. The Board Misconstrued the Phrase "*Acquiring Interest Data*." ......... 4
1. There Is No Dispute That the Plain Meaning of "*Acquiring*" Is "Retrieving." ........................................................................ 5
2. The Patentee Did Not Redefine "*Acquiring*" or "*Acquiring Interest Data*." ................................................................................ 6
3. Nobots's Lexicography Argument Impermissibly Renders Other Terms in Claim 19 Meaningless. ...................................... 14
4. Nobots's Lexicography Argument Is Incompatible with Dependent Claim 20. ............................................................... 19
5. Nobots's Lexicography Argument Is Inconsistent with Its Infringement Position. ................................................................ 23
CONCLUSION .......................................................................................... 29
CERTIFICATE OF COMPLIANCE ........................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*AstraZeneca AB v. Mut. Pharm. Co.*,
384 F.3d 1333 (Fed. Cir. 2004) ....................................................................6

*Bell Atl. Network Servs. v. Covad Comm'ns. Grp.*,
262 F.3d 1258 (Fed. Cir. 2001) ....................................................................6

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021) ....................................................................24

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008) ....................................................................16

*In re Google Tech. Holdings, LLC*,
980 F.3d 858 (Fed. Cir. 2020) ....................................................................15

*Interactive Gift Exp., Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .............................................................. 15, 28

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................................................................14

*Multilayer Stretch Cling Film Hldgs., Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016) ....................................................................23

*Netflix, Inc. v. DivX, LLC*,
2022 WL 2298983 (Fed. Cir. 2022) ..............................................................16

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) ....................................................................5

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ....................................................................15

*SkyHawke Techs., LLC v. Deca Int'l Corp.*,
828 F.3d 1373 (Fed. Cir. 2016) ....................................................................20

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................................ 2, 5, 6, 7

*Trustees of Columbia Univ. v. Symantec*,
811 F.3d 1359 (Fed. Cir. 2016) ....................................................................6

*Vederi, LLC v. Google, Inc.*,
744 F.3d 1376 (Fed. Cir. 2014) ..................................................................18

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ....................................................................21

*VLSI Tech. LLC v. Intel Corp.*,
53 F.4th 646 (Fed. Cir. 2022) .....................................................................14

*World Class Tech. Corp. v. Ormco Corp.*,
769 F.3d 1120 (Fed. Cir. 2014) ....................................................................6

# INTRODUCTION[1]

This appeal boils down to one issue: lexicography. The parties agree that a patentee can redefine a claim term to have a meaning that differs from its plain and ordinary meaning. The parties also agree that the patentee here set forth an explicit definition for the term "*interest data*," which says that "*interest data*" can be active or passive data. The parties also agree that the ordinary meaning of the word "*acquiring*" is simply retrieving. The interpretation of the phrase "*acquiring interest data*" in claim 19 should thus be straightforward—*i.e.*, retrieving active or passive data.

The parties further agree that the prior-art Kitts reference retrieves passive data and meets all other elements of claim 19. Kitts therefore anticipates claim 19 as properly construed.

At Nobots's behest, the Board came to a different conclusion by construing "*acquiring interest data*" as limited to retrieving active data. To get there, the Board focused on a ***different*** defined term that does not appear in claim 19, *i.e.*, "acquired data." The patentee defined "acquired data" as well as "its equivalents and verb forms" to be active data.

[1] Emphasis is added throughout and claim language is italicized. Nobots's response brief is abbreviated "Red Br.," and Google's opening brief is abbreviated "Blue Br."

Nobots tries to defend the Board's claim construction with the following reasoning: (**a**) "acquiring data" is a verb form of "acquired data," (**b**) "*interest data*" is a type of data, and (**c**) therefore the patentee's definition of "acquired data" also applies to the ***different*** phrase "*acquiring interest data*" such that that different phrase is limited to retrieving active data. But this convoluted (and result-oriented) reading of an otherwise straightforward three-word claim phrase is incompatible with this Court's lexicography precedent.

Because the default for claim construction is that a claim term's ordinary meaning generally applies, the standard for redefining a term to have a different meaning is "exacting." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012). The multiple steps Nobots takes to justify applying a definition of one specific term—"acquired data"—to a different phrase—"*acquiring interest data*"—that itself deliberately uses a different (and broader) defined term—"*interest data*"—cannot satisfy this Court's "exacting" standard.

Nobots does not dispute that lexicography is an exacting standard; Nobots simply contends the standard was met. But the intrinsic evidence Nobots cites confirms nothing more than that the patentee defined the term "acquired data" and its equivalents as limited to active data. For example, Nobots cites passages in the specification that use the term "acquired data" or its equivalents (*e.g.*, "data acquired") in a manner consistent with the patentee's definition of that term. Those

passages, however, do not address the question of whether the phrase "*acquiring **interest data***" should be limited by the unique definition of the different term "acquired data."

On that more salient issue, Google's opening brief identified several aspects of the intrinsic record that compel a broader, plain-and-ordinary meaning of the word "*acquiring*" in the phrase "*acquiring interest data*." For example, Google showed how limiting "*acquiring interest data*" to retrieving active data effectively erases the defined term "*interest data*" from the claim. Google likewise showed how the specification's summary description of a series of "invention embodiments" uses the term "*acquiring*" according to its plain meaning. Appx60 (3:47-60). Nobots's response to that intrinsic evidence and Google's other arguments is composed of unfounded allegations of waiver, strained readings of otherwise clear text, or a combination of the two. When the dust settles, however, the construction of "*acquiring interest data*" remains straightforward—*i.e.*, retrieving "*interest data*," which encompasses retrieving passive or active data.

## ARGUMENT

### A. The Board Misconstrued the Phrase "*Acquiring Interest Data.*"

Nobots does not dispute that if Google's proposed construction for the phrase "*acquiring interest data*"—*i.e.,* retrieving active or passive data—is correct, then Kitts anticipates claim 19 because Kitts's system retrieves passive data from a client device, *e.g.*, the device's IP address. Blue Br. at 10-12, 45-46. Google likewise admits that Kitts only discloses the retrieval of passive data, so if the phrase requires the retrieval of at least some active data, as the Board found, then Kitts does not anticipate.[2]

The lone question for the Court to resolve is thus whether the word "*acquiring*," in the phrase "*acquiring interest data*" should be afforded its plain meaning or if the patentee, when defining a different term, also narrowly defined "*acquiring*" to require retrieval of at least some active data. As Google's opening brief established, the exacting standard for lexicography has not been met in this case, and "*acquiring*" should be given its ordinary meaning.

---

[2] Of course, retrieving active data with or without passive data was conventional long before the '008 patent. *See, e.g.*, Appx17-19 (describing how the prior-art Willner system retrieves active data such as the movement of a user's cursor).

### 1. There Is No Dispute That the Plain Meaning of "*Acquiring*" Is "Retrieving."

Nobots spends several pages of its brief emphasizing that claim terms must be read in view of the specification, not in a vacuum. Red Br. at 14-16. Google does not disagree. That non-controversial legal proposition, however, does not mean that the plain language of a claim term is ***irrelevant*** to understanding its meaning. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[T]he claim construction inquiry…begins and ends in all cases with the actual words of the claim.").

Indeed, the plain meaning of a claim term is highly relevant to the claim construction process because, absent lexicography or disavowal in the specification, that plain meaning controls. *Thorner*, 669 F.3d at 1365. That is why Google's opening brief discussed the plain meaning of "*acquiring*"—*i.e.*, retrieving—and explained why that plain meaning is "logical" in the larger context of claim 19. Blue Br. at 25-27.

At no point in its response brief does Nobots suggest that retrieving is not the plain meaning of "*acquiring*." Nobots likewise does not suggest that "*interest data*" is a term with a plain meaning; it is instead a coined term that the patentee defined to include active or passive data. The straightforward meaning of "*acquiring interest data*" is therefore retrieving active or passive data, and the lone question to resolve is whether the specification sets forth some narrower definition for "*acquiring*" (or

"*acquiring interest data*") or otherwise disavows the term's ordinary meaning. It does not.

### 2. The Patentee Did Not Redefine "*Acquiring*" or "*Acquiring Interest Data*."

The parties agree that lexicography is an "exacting" standard, *Thorner*, 669 F.3d at 1365-66, requiring a patentee to redefine a term with "clarity," *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014). Blue Br. at 27; Red Br. at 17.

Nobots cites *Trustees of Columbia Univ. v. Symantec*, 811 F.3d 1359 (Fed. Cir. 2016) and *Bell Atl. Network Servs. v. Covad Comm'ns. Grp.*, 262 F.3d 1258 (Fed. Cir. 2001) for the proposition that a patentee can redefine a term expressly or by implication. Red Br. at 23-24. But, regardless of whether the patentee redefines a term expressly or by implication, the patentee's redefinition of the term recited in the claim must be ***clear***. *Bell Atl.*, 262 F.3d at 1276 ("[I]t is ***clear*** that the specification defines by implication…"); *Trustees of Columbia*, 811 F.3d at 1364 ("[A] ***claim term*** may be ***clearly*** redefined without an explicit statement of redefinition").[3] Such clarity is missing in this case.

---

[3] Nobots also cites (Red Br. at 24) *AstraZeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333 (Fed. Cir. 2004), but that case confirms the exacting standard for lexicography. *Id*. at 1337-39 (explaining that the specification must "provide[] ***clear*** lexicography" and finding lexicography for the term "solubilizer" where specification said "solubilizers suitable according to the invention are defined below").

Nobots openly admits that its lexicography argument requires at least three distinct steps. Red Br. at 21. According to Nobots:

1. The patentee defined the term "acquired data" as well as its "verb forms and equivalents" to require active data. *Id*. at 21.
2. "Acquiring data" is a verb form of "acquired data" such that the patentee "define[d] the act of 'acquiring data' as retrieving at least some 'active data.'" *Id*. at 12, 21.
3. "*Interest data*" is a form of data, and therefore the phrase "*acquiring interest data*" is the act of "acquiring data" in the form of "*interest data*," and therefore the type of "*interest data*" that is retrieved must be active data. *Id*. at 21.

The flaw in Nobots's argument is that although the patentee defined "acquired data" with sufficient clarity (step 1), and even if the patentee defined "acquiring data" via a vague reference to "verb forms and equivalents" (step 2), the patentee did ***not*** set forth any definition of the word "*acquiring*" by itself or the three-word phrase "*acquiring interest data*." Blue Br. at 30-32. The patentee knew how to define a term with the clarity and precision that this Court's precedent requires, and the patentee simply elected not to define either "*acquiring*" or "*acquiring interest data*." *Thorner*, 669 F.3d at 1365 ("To act as its own lexicographer, a patentee must

clearly set forth a definition ***of the disputed claim term*** other than its plain and ordinary meaning.") (quotation omitted).

Like the Board (Appx16-17), Nobots repeatedly acts as if the patentee redefined the individual words "acquired" or "acquiring." Red Br. at 14 ("why did the patentee choose to use a specifically defined word ('acquiring')"); *id.* at 18 ("the defined act of *acquiring*…" (italics original)). But the patentee did not. The patentee defined the coined term "acquired data," but the patentee never defined—much less with the clarity this Court's precedent requires—the words "acquired" or "*acquiring*" to have a meaning different than their ordinary meaning, much less the full phrase "*acquiring interest data*." Nobots identifies no case from this Court in which the express definition for one term in the specification was found to clearly redefine a different phrase that uses a different string of words.

Tacitly conceding that the patentee did not explicitly redefine the word "*acquiring*," Nobots argues that the patentee nonetheless disavowed the word's ordinary meaning because the specification makes "repeated and exclusive association of various forms of 'acquire' with 'active data.'" Red Br. at 15; *see also id.* at 25. But the passages in the specification that Nobots cites (Red Br. at 9-10, 32) use the ***defined term*** "acquired data" or its direct equivalent. Appx60 (3:66-4:17) ("…***acquired data*** requires some form of information capture means…"); Appx59 (2:59-60) ("Active model data comprises ***data acquired***…"); Appx59

(2:18-21) ("***acquired*** and/or available ***data***"). The passages Nobots identifies underscore that when the patentee wanted to associate "acquired" with active data, the patentee used the defined term ("acquired data") or that term's equivalent ("data acquired"). Nobots identifies no passage in the specification where the word "*acquiring*" is used by itself to limit the type of data that is retrieved.

In contrast, Google's opening brief identified a passage in the specification that summarizes "various invention embodiments," and uses a form of the word "*acquiring*"—by itself—in a manner consistent with its plain meaning and inconsistent with the Board's narrow construction. Blue Br. at 32-34. For ease of reference, the passage is reproduced below:

> With the foregoing definitions in mind, operation of the various invention embodiments can be better understood. In a first series of embodiments, a comparison between interest data, ***acquired*** prior to delivery of issued data to the client computing device, and model data is performed to ascertain the likely status of the client computing device, i.e., human user or bot 130, 420. In a second series of embodiments, a comparison between monitored data, by definition ***acquired*** after delivery of issued data to the client computing device, and model data is performed to ascertain the likely status of the client computing device, i.e., human user or bot 130, 420. In both series of embodiments, acquired and/or available data may be used for comparison with suitable model data.

Appx60 (3:47-60).

The passage says that in a first series of embodiments "interest data" is "acquired" and then compared to model data, and in a second series of embodiments "monitored data" is "acquired" and compared to model data. Both "interest data"

and "monitored data" are defined to include active or passive data. Appx60 (3:37-46). The passage concludes by saying that in either series of embodiments, "acquired and/or available data may be used for comparison with suitable model data."

The use of the phrase "and/***or***" in the concluding sentence means that the "interest data" or "monitored data" that is "acquired" and then compared to model data (*i.e.*, "used for comparison with suitable model data") can be simply "available data," which the specification explicitly defines as "passive data." Appx60 (3:18-24). That is, the "interest data" that is "acquired" in the first series of embodiments may simply be ***passive data***.

Thus, Google explained, the passage confirms that the patentee intended to give "*acquiring*" its ordinary meaning when used as a word in a phrase or sentence with "*interest data*." Blue Br. at 32-34. In response, Nobots argues that the "final sentence merely teaches that *additional* data, whether 'acquired and/or available,' *could be* ('may be') used in those embodiments." Red Br. at 29 (emphasis original). That is a remarkably strained reading of the sentence. The only "data" that the passage describes as being used for comparison with model data is the "interest data" or "monitored data" which are referred to as being ***acquired***. There is no suggestion in the passage that the referenced "acquired and/or available data" is "additional"

data that "could be" used for the comparison. Only a result-oriented interpretation of the passage would make such a suggestion seem even remotely plausible.

Nobots tries to justify its interpretation of the disputed passage by observing that it describes a first and second "series" of embodiments, which—according to Nobots—suggests that there are embodiments where only the acquired "interest data" or "monitored data" is used, plus embodiments where additional data is also used with the acquired data. Red Br. at 29-30. But the "series" language more naturally reflects the fact that the acquired "interest data" or "monitored data" can be available (*i.e.*, passive) data, acquired (*i.e.*, active) data, or both. Appx60 (3:58-60) ("acquired and/or available data may be used"). In other words, there are embodiments in the series in which the acquired "interest data" is "acquired data" (*i.e.*, active data), embodiments in which acquired "interest data" is "available data" (*i.e.*, passive data), and embodiments in which it is both. Again, Nobots's strained reading—which is premised on some unidentified "additional" data being part of the comparison—is difficult to reconcile with what the passage actually says.

Nobots also argues that Google reads the "[series of embodiments] passage in isolation from the remainder of the specification." Red Br. at 28. It is Nobots, however, that reads the passage without regard for the specification's other teachings.

For example, if Nobots's reading of the passage were correct, then the clause "monitored data, ***by definition*** acquired after delivery of issued data to the client computing device" would necessitate that monitored data was ***by definition*** "at least some active data" because the "monitored data" is described as being "by definition acquired." Red Br. at 27. The explicit definition of "monitored data" set forth in the patent, however, defines "monitored data" as "active ***or*** passive data…obtained…after the generation of issued data." Appx60 (3:37-41). Put simply, "monitored data" ***by definition*** encompasses active and/***or*** passive data, yet Nobots's reading of the passage would limit monitored data's ***definition*** to requiring active data, in direct conflict with the patent's explicit definition of that term. Clearly, that is not the meaning of the "series of embodiments" passage. What it instead says is that "monitored data[] [is] by definition ***acquired after*** delivery of issued data," which is referring to the patent's definition of "monitored data" as being "***obtained…after*** the generation of issued data." This further underscores that the patentee intended for the word's plain meaning (*e.g.*, "obtained") to apply when using the word "acquired" (or its variant) by itself and not in the defined phrase "acquired data."

Google noted in its opening brief that the Board never explained how its construction of "*acquiring interest data*" could be reconciled with the "series of embodiments" passage. Blue Br. at 34. Nobots says the Board did not ignore the

passage because the Board cited certain pages in Google's reply brief below that discussed the passage and one member of the Board asked Google a question about it at the oral hearing. Red Br. at 30-31. In neither instance, however, did the Board actually explain how it was interpreting the passage, much less explain how that interpretation could be squared with the Board's claim construction. To be clear, Google is not seeking a remand for the Board to provide that explanation now—Google is pointing out the lack of any such explanation as corroboration that the Board's construction ***cannot*** be squared with the passage's plain text.

Finally, Nobots also argues that the plain meaning of "*acquiring*" should not apply because the patentee used similar but different words (like "received") when describing the retrieval of data more generally. Red Br. at 11, 18, 32, 55. That the patentee sometimes used synonyms like "received" or "obtained" is irrelevant, however, because (as discussed above) the "series of embodiments" passage confirms that the patentee also used the term "acquiring" to describe the retrieval of data more generally, *e.g.*, retrieval of "interest data" or "monitored data," each of which is a general form of data that the "series of embodiments" passage confirms can be implemented as active and/or passive data even when discussed as having been "acquired." Because the "series of embodiments" passage uses a form of the

disputed term "*acquiring*," it is plainly more relevant to resolving the parties' dispute over what "*acquiring interest data*" means than the other passages Nobots cites.[4]

### 3. Nobots's Lexicography Argument Impermissibly Renders Other Terms in Claim 19 Meaningless.

As Google explained in its opening brief, construing "*acquiring interest data*" as limited to the retrieval of active data effectively re-writes claim 19 to recite "acquiring data" rather than "*acquiring* ***interest*** *data*," which erases "*interest data*" from the claim. Blue Br. at 36-39. Failing to give "*interest data*" any meaning, as the Board did, is improper under well-settled claim construction principles. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *VLSI Tech. LLC v. Intel Corp.*, 53 F.4th 646, 655 (Fed. Cir. 2022).

Nobots's response is principally a meritless allegation of waiver. Nobots argues that Google did not previously make this particular argument about the intrinsic record (*i.e.*, the claims themselves) and therefore it is waived. Red Br. at 33-35. "The doctrine of waiver," however, "does not preclude a party from supporting its original claim construction with new citations to intrinsic evidence of

---

[4] Nobots's implicit contention that the various cited ***synonyms*** of "acquiring" are not "***equivalent[s]***" of acquiring (and thus are not subject to the patent's definition of "acquired data") further highlights the ambiguity in the patent's definitional language. Appx60 (3:25-32) ("as used herein, 'acquired data,' ***its equivalents*** and verb forms").

record." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1289 (Fed. Cir. 2021). That is all that Google has done.

The key for waiver in the context of claim construction is whether a party is advocating on appeal for a claim construction that differs from the one the party advocated below. *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1347-48 (Fed. Cir. 2001) (explaining that "only arguments that change the scope of [a party's] claim construction positions from those advanced [below] will be deemed to be waived"). Here, Google's position throughout has been that "*acquiring interest data*" means retrieving passive or active data. *See, e.g.*, Appx1138-1139; Appx1378-1382. That Google is "proffering [an] additional argument[]" from the intrinsic evidence "in support of its existing claim construction" is entirely permissible. *Interactive Gift*, 256 F.3d at 1348.

Nobots cites *In re Google Tech. Holdings, LLC*, 980 F.3d 858 (Fed. Cir. 2020), a decision in which this Court found a claim-construction argument waived. Red. Br. at 34-35. But in that case the appellant sought "to press, on appeal, a specific claim ***construction*** that it did not present" to the Board. *Google Tech.*, 980 F.3d at 863-64. It was an entirely new claim construction allegedly being presented for the first time on appeal, not a new argument in support of a previously presented

claim construction. Google has done no such thing in this appeal, and there is no waiver.[5]

On the merits, Nobots contends that the Board did not re-write the claim because the Board never explicitly said that "*acquiring interest data*" "precludes the retrieval of other data (e.g., passive data) in addition to the retrieval of active data." Red Br. at 36. But the Board was explicit in reasoning that the "premise" that "acquired" data could "also encompass 'passive' data" is "entirely absent from the Specification." Appx16. The Board was right insofar as ***nothing*** in the definition of "acquired data" permits such data to include "passive data." Appx60 (3:25-32). Therefore, if the definition of "acquired data" applies to the phrase "*acquiring interest data*," then "*acquiring interest data*" requires retrieving active data, which effectively eliminates "*interest data*" from the claim given that "*interest data*" is defined to include active ***or passive*** data. Appx60 (3:41-46).

Nobots argues that, in context, the Board's statement did not intend to limit "*acquiring interest data*" to active data alone. Red Br. at 36. But while the Board's statement was made in the context of rejecting Google's arguments regarding

[5] Nobots cites (Red Br. at 34) two additional waiver decisions from this Court but neither decision deals with the unique context of claim construction, and in any event each decision involved entirely new arguments, not merely new support for an existing argument. *Netflix, Inc. v. DivX, LLC*, 2022 WL 2298983, *7 (Fed. Cir. 2022) (finding new obviousness argument waived); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323-24 (Fed. Cir. 2008) (finding new argument as to what a prior-art reference discloses waived).

particular disclosures in the specification, the Board was crystal clear that "***consistent with the remainder of the Specification***" the premise that "'acquired' data" can include "'passive' data…is entirely absent" from the patent. Appx16. Read in context, the Board plainly (and correctly) found that the definition of "acquired data" only allows for the retrieval of active data.

Nobots also argues that "claim 19," more generally, permits "the retrieval of passive data." Red Br. at 36; *see also id.* at 35 ("Google is asking the Court read claim 19 as imparting a negative limitation…"). Nobots may be right in the sense that claim 19, which uses the term "*comprising*," does not preclude performing additional steps beyond those recited in the claim. The fact that the claimed ***method*** may "*compris[e]*" additional steps, however, does not broaden the scope of an individual step explicitly recited in the claim, like the "*acquiring interest data*" step. Under the lexicography-based rationale the Board adopted to reach its construction of "*acquiring interest data*," that particular step would preclude the retrieval of only passive data, which is why the Board's construction reads "*interest data*" out of the claimed step where it is explicitly recited.

Nobots further argues that even if "*acquiring interest data*" is limited to active data, that construction does not render "*interest data*" meaningless because there are other aspects of the definition for "*interest data*" beyond it being active or passive data. Red Br. at 37-38. In particular, Nobots observes that "*interest data*" is defined

as "correlat[ing] to any data within model data." Red Br. at 37 (quoting Appx60 (3:41-46)). Thus, Nobots contends, the term "*interest data*" still has meaning in claim 19—it adds the need that the "*interest data*" correlate with model data—even if the term is limited to active data. *Id.*

Claim 19, however, already recites "*comparing* ***the*** *interest data to model data*," and thus claim 19 already requires that the "*interest data*" be correlated with model data. The lone aspect of the definition for "*interest data*" that is not already explicitly recited in claim 19, and thus the only aspect of the definition that the term "*interest data*" itself adds to the claim is the fact that "*interest data*" comprises active or passive data. Construing "*acquiring interest data*" as limited to retrieving active data thus impermissibly reads "*interest data*" out of the claim. *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382-83 (Fed. Cir. 2014).

Finally, Google also explained in its opening brief that limiting "*acquiring interest data*" to the retrieval of active data is also inconsistent with claim 19's requirement that "*the interest data*" be compared to "*model data*," which the patent defines as also including active or passive data. Appx59 (2:54-60); Blue Br. at 14-15, 32-34]. Nobots's response is a surprisingly candid concession:

> "If anything, the fact that the 'model data' more broadly encompasses both 'active model data' and 'passive model data' evidences that 'acquiring interest data' was not intended to be limited to retrieving interest data consisting of 'active data alone.'"

Red Br. at 38.

That is precisely ***Google's point***. Because "*interest data*" can be either active or passive data and "*model data*" can be either active or passive data, then limiting "*acquiring interest data*" to the retrieval of active data—as the reasoning behind the Board's claim construction does—deprives either of the two defined terms any meaning in the context of claim 19. Despite Nobots's arguments to the contrary (Red Br. at 16, 18), applying the Board's narrow construction to claim 19 results in an ***illogical*** claim in which defined terms are used but their definitions are rendered meaningless.

### 4. Nobots's Lexicography Argument Is Incompatible with Dependent Claim 20.

Dependent claim 20 recites "*wherein the interest data* ***consists of*** *available data*." Appx61. Google explained that if "***the*** *interest data*" recited in claim 20 is the "*interest data*" that is "*acquir[ed]*" in claim 19, then dependent claim 20 requires that "*acquiring interest data*" in claim 19 must encompass "*acquiring*" ***only*** available data, *i.e.*, passive data. Blue Br. at 40-42. Google then identified several reasons why claim 20 should be read to depend from claim 19. *Id.*

In response, Nobots spends nearly eleven pages debating whether claim 20 depends from claim 1 or claim 19, but ultimately concludes with the frank concession that claim 20's dependency is subject to "reasonable debate." Red Br. at 47. But if it is reasonable for POSAs to debate whether to interpret claim 20 as depending from claim 19, and thus to reasonably debate whether "*acquiring interest*

*data*" in claim 19 must encompass the "*acquiring*" of only passive data in claim 20, then the "exacting" standard for lexicography cannot possibly be met in this case. Nobots's frank concession should end the matter.[6]

Nonetheless, turning to the merits, Nobots first argues that Google is bound by the Board's determination that claim 20 depends from claim 1 because Google prevailed in proving claim 1 unpatentable and Google did not appeal that determination.[7] Red Br. at 38-39. But that is not the law. Because Google prevailed before the Board, it could not appeal its victory. *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1375 (Fed. Cir. 2016) (explaining that the "prevailing party in a lower tribunal cannot ordinarily seek relief in the appellate court"). By the same token, because Google could not appeal the Board's claim-construction finding for claim 20, Google is not bound by that interpretation on appeal.[8] *Id.* at 1376. Nobots's waiver argument is meritless.

Nobots next argues that the file history confirms that claim 20 was intended to depend from claim 1. Red Br. at 39-43. The office action response that Nobots

---

[6] Nobots notes that Google initially took the position that claim 20 was indefinite (Red Br. at 40), but Google' prior position only serves to further confirm that there is a "reasonable debate" as to claim 20's dependency.

[7] Google argued claim 20 was unpatentable whether it depended from claim 1 or claim 19. Appx165-166; Appx193-194.

[8] To be clear, Google is not seeking a formal construction of claim 20—Google is simply pointing to claim 20's language as additional intrinsic-evidence support for Google's interpretation of "*acquiring interest data*" in claim 19.

cites, however, merely repeats the same mistake in claim numbering that appears in the issued claims. *Id.* (citing Appx291-292). Critically, there is nothing in the response that remotely explains (a) the lack of antecedent basis in claim 1 for claim 20's "***the** interest data*" while such antecedent basis is present in independent claim 19 or (b) the fact that claim 20 follows immediately after independent claim 19, not independent claim 1 as would be conventional if it depended from that claim.[9]

Nobots also argues that the Court should defer to the interpretation of the file history that Nobots's expert provided. Red Br. at 43. But the file history is intrinsic evidence that this Court reviews *de novo* and therefore the Court need not defer to an expert's testimony regarding it. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("Allowing the public record [*e.g.*, file history] to be altered or changed by extrinsic evidence ..., such as expert testimony, would make [the public's right to rely on that record] meaningless.").

As for the critical question of where the antecedent basis for claim 20's "***the** interest data*" can be found in claim 1, Nobots simply speculates that it was a mistake and claim 20 "was intended to refer to 'the *model* data' of claim 1." Red Br. at 43. This strained reading, however, requires the Court to believe that the patentee mistakenly used one defined term ("*interest data*") when the patentee meant to use

---

[9] Claims 1-20 (which were originally claims 2-21) were added during prosecution at the same time. Appx237-239. That is, claim 20 was not added by itself later in prosecution and the claim was always intended to follow directly after claim 19.

another ("*model data*"). Google's interpretation is plainly more reasonable. Claim 20's "*the interest data*" refers to the "*interest data*" of claim 19 which just so happens to be the immediately preceding claim.

Nobots's reading is also in tension with dependent claim 4 which unambiguously depends from claim 1 and already limits "*the model data*" of claim 1 to "*compris[ing] passive model data*." Appx61. If "*the interest data*" of claim 20 were intended to refer to the "*model data*" of claim 1, then it would limit the "*model data*" in claim 1 to passive data but claim 4 already requires that claim 1's "*model data*" include passive model data. Nobots says its reading of claim 20 "follows the drafting of dependent claim 4," but its reading results in two dependent claims reciting similar subject matter.

Moreover, Nobots does not account for the fact that when the specification describes "model data" as being either active or passive data, it uses the terms "active model data" or "passive model data." Appx59 (2:59-60). This is consistent with dependent claims 2 and 4 which explicitly limit "*the model data*" of claim 1 to including either "active model data" or "passive model data." Appx61. In contrast, the specification expressly refers to "*interest data*" as including "available data," which makes reading claim 20 as depending on claim 19 entirely consistent with the specification. Appx60 (3:41-6).

Finally, Nobots argues that even if Google is right that claim 20 should be read to depend from claim 19, that is irrelevant because "the language of a dependent claim ***cannot*** change the scope of an independent claim whose meaning is clear on its face." Red Br. at 48 (quoting *Multilayer Stretch Cling Film Hldgs., Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1360 (Fed. Cir. 2016)) (emphasis original). Yet, if claim 20 depends from independent claim 19, then the meaning of claim 19 that is "clear on its face" is ***Google's*** interpretation—the plain meaning of "*acquiring*" and the defined meaning of "*interest data*" govern, and "*acquiring interest data*" encompasses retrieving passive data, active data, or both, precisely as Google has argued in this appeal.

At the end of the day, however, the proper construction of claim 20 need not be resolved because the claim—at a minimum—highlights that the patentee did not define "*acquiring interest data*" with the exacting precision that this Court's lexicography precedent requires. If Google and Nobots can have a reasonable debate as to the scope of claim 20 and thus the scope of claim 19, then the patentee plainly did not define "*acquiring interest data*" with the precision needed to preclude such a debate.

#### 5. Nobots's Lexicography Argument Is Inconsistent with Its Infringement Position.

Google's opening brief explained that Nobots's position in the parties' co-pending litigation for purposes of accusing Google of infringement was that

"*acquiring interest data*" was met if a system retrieves passive data. Blue Br. at 42-44. As Google explained, Nobots's interpretation of "*acquiring interest data*" in the district court was therefore incompatible with its interpretation before the Board, and such incompatibility ran afoul of this Court's caution that claim language should not be treated as a "nose of wax, in one way to avoid invalidity and another to find infringement." *Id.* at 43 (quoting *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021)).

In response, Nobots engages in a hindsight-based reading of its infringement contentions to try to show the Court where Nobots also alleged that Google's system infringed because it retrieved active data in addition to passive data. Red Br. at 49-53. But any objective reading of Nobots's infringement contentions makes clear that for purposes of infringement, Nobots took the position that a system that retrieves passive data ***alone*** allegedly infringes claim 19 and thus a prior-art system, like Kitts, that retrieves passive data ***alone*** would also anticipate claim 19. The Court should take Nobots's inconsistent position into account when assessing the merits of the parties' claim-construction dispute.

Before turning to its hindsight-reading of the contentions, Nobots first alleges that Google "[m]ischaracterizes the [l]aw." Red Br. at 49-51. According to Nobots, because its infringement contentions were preliminary, it should not be bound by them. *Id.* This argument is irrelevant because Google is not arguing that Nobots is

formally bound to its prior interpretation. Rather, Google's argument is that Nobots's prior interpretation further highlights that even Nobots initially understood the word "*acquiring*" in the phrase "*acquiring interest data*" to have its plain meaning, not the narrow meaning to which Nobots pivoted when confronted with Kitts's anticipatory disclosure. Nobots may not be bound by its prior interpretation, but that interpretation is nonetheless relevant for understanding how POSAs would interpret the "*acquiring interest data*" limitation.

Turning to Nobots's hindsight-reading of the infringement contentions, Nobots does not dispute Google's showing that the portions of those contentions addressing claims 19 and 20 cite the retrieval of passive data in the form of cookies or IP addresses as evidence that Google's system allegedly performs the "*acquiring interest data*" limitation. Blue Br. at 43-44. Instead, Nobots scours its contentions for references to active data to suggest that Nobots ***also*** pointed to the retrieval of active data as a necessary precondition for Google's system to allegedly infringe.

The first reference to active data that Nobots found is a reference to a "user's cursor movements." Red Br. at 52. This reference is found at Appx1916. As the Court can see, that page of the contentions includes a snippet from a website that describes how reCAPTCHA tests purportedly work. Appx1916. The prose at the top of the page that Nobots wrote alleges that the snippet shows "[t]he use of other interest data, such as cookies and device history," both of which are types of passive

data. *Id.*; Appx60 (3:9-16). The page also includes a red-box annotation that draws the reader's focus to a portion of the webpage-snippet that describes how a user's cookies and device history (passive data) are retrieved. Appx1916.

The reference to a "user's cursor movements," that Nobots now wants the Court to believe was a focus of the contentions, is found within the red-box annotation but is not otherwise highlighted, and the prose that Nobots added to explain the significance of the webpage-snippet does not mention "user's cursor movements" at all. Appx1916. In fact, the portion of the webpage-snippet that is ***not*** within the red-box annotation also mentions "movement of the user's cursor," which suggests that such data was not what Nobots was identifying as evidence of infringement. Objectively read, Nobots's contentions did not identify the retrieval of a "user's cursor movements" as evidence of infringement for claim 19, and only a hindsight-based re-interpretation of Appx1916 would suggest that they did.

The second reference to active data that Nobots found is a reference to a "User Interaction." Red Br. at 52. This reference is found at Appx1915. That page of the contentions includes a snippet and transcript text allegedly from a YouTube video describing how reCAPTCHA tests work. Appx1915. The prose at the top half of the page that Nobots wrote alleges that Google practices the "*acquiring interest data*" limitation because its servers allegedly "***obtain***[] interest data in the form of browser cookies, the user agent of the browser, and/or one or more IP address," all

of which are types of passive data. *Id.*; Appx60 (3:9-16). That is, Nobots understood "*acquiring interest data*" to mean "obtaining," *i.e.*, retrieving, "interest data" in the form of passive data. This is precisely Google's position. Nobots's contentions also highlight a portion of the transcript text that purportedly discusses how Google's servers receive "a user's IP address," *i.e.*, passive data, as part of the reCAPTCHA process. Appx1915; *see also* Appx1915 ("For the most suspicious IPs…").

The reference to a "User Interaction" that Nobots now seizes upon inconspicuously appears in the snippet of YouTube video among a list of "signals" that include passive data like IP addresses. Appx1915. As with the first reference discussed above, Nobots did not highlight or otherwise draw any attention to the passing mention of "User Interaction" in the snippet. Instead, it exclusively drew the reader's attention to the alleged retrieval of passive data types like IP addresses or cookies, which is entirely consistent with the proper meaning of "*acquiring interest data*" and inconsistent with the Board's narrower interpretation.

Nobots also points to its contentions' analysis for a different limitation of claim 19 (element 19[b]) as alleged evidence that it identified active data as part of the "*interest data*" that Google's servers allegedly "*acquir[e]*." Red Br. at 52. Specifically, Nobots notes that its infringement contentions for element 19[b] refer back to element 1[d] which Nobots says discusses how active data is compared to model data. *Id.* True or not, element 1[d] is irrelevant because (**a**) claim 1 does not

refer to "*interest data*" at all, and (**b**) "***the*** *interest data*" recited in element 19[b] is the "*interest data*" that was "*acquir[ed]*" in element 19[a], which is passive data as discussed above. Nobots's infringement contentions for element 1[d] are simply irrelevant to the interpretation of "*acquiring interest data*" in element 19[a].

Turning to dependent claim 20, Google's opening brief explained how Nobots's infringement contentions confirmed both that Nobots understood claim 20 to depend from claim 19 and that it understood "*acquiring interest data*" to be met when only passive data is retrieved. Blue Br. at 44. In response, Nobots first alleges this argument is waived. Red Br. at 53. But the argument—which supports the same claim construction that Google advanced before the Board—is not waived for the reasons discussed *supra* p. 15. *Interactive Gift*, 256 F.3d at 1348.

On the substance, Nobots simply notes that its infringement contentions for claim 20 also say: "***See also Claim 1***." Red Br. at 53-54 (quoting Appx1922) (emphasis original). Whatever Nobots intended by its vague citation to claim 1—which, again, does not even include the term "*interest data*" at all—that citation simply cannot trump Nobots's unambiguous reference to claim 19 in its contentions for claim 20. Appx1922-1923. If, as Nobots now contends, claim 20 did not depend from claim 19, then why did Nobots specifically refer to claim 19 ***twice*** as demonstrating how Google's system allegedly obtains "*the interest data*" recited in

claim 20? Appx1922 ("based on interest data in the manner set forth in Claim 19"); Appx1923 ("As demonstrated by Claim 19 above…").

In short, the most strident advocate for Nobots's claim construction—Nobots itself—was once under the impression that "*acquiring interest data*" meant, in its own words, "obtaining interest data," and that the limitation was satisfied if a system obtained only passive data such as IP addresses or cookies. Appx1915. Only when faced with Kitts's anticipatory disclosure did Nobots pivot to its current lexicography-based construction. But the proper construction of a claim term does not vary to suit the desires of a patentee. At a minimum, Nobots's inconsistent treatment of "*acquiring interest data*" confirms that the exacting standard of lexicography has not been met in this case.

## CONCLUSION

The Board's finding that claim 19 was not proven unpatentable should be reversed.

Respectfully submitted,

Date: October 16, 2024

/s/ Nathan R. Speed
Nathan R. Speed
Elisabeth H. Hunt
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

## CERTIFICATE OF COMPLIANCE

I, Nathan R. Speed, counsel for Appellant, certify that the foregoing brief complies with the type-volume limitation set forth in Fed. Cir. Rule 32(a). Specifically, this brief contains 6,852 words (excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2)) as determined by the word count feature of the word processing program used to create this brief.

I further certify that the foregoing brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). Specifically, this brief has been prepared using a proportionally spaced typeface using Microsoft Word 365, in 14-point Times New Roman font.

Date: October 16, 2024

*/s/ Nathan R. Speed*
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC*

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that a true and correct copy of the foregoing **Reply Brief of Appellant Google LLC** has been electronically filed with the Clerk of Court using the CM/ECF system, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including principal counsel for Appellee.

Date: October 16, 2024

*/s/ Nathan R. Speed*
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
BOSTON, MA 02210

*Counsel for Appellant Google LLC.*